JUSTICE MIN. CO. v. BARCLAY et al.

(Circuit Court, D. Nevada. August 9, 1897.)

No. 632.

1. MINES AND MINING—CONTINUITY OF VEINS—EXPERT EVIDENCE.

In determining questions as to whether ore bodies found in different claims are parts of a continuous vein or lode, or are separate and independent veins, a wide latitude is always permissible for the purpose of ascertaining the reasoning upon which the conclusions of witnesses are based, as well as their general knowledge of the ground, their experience and observation, and their qualifications as practical miners or experts, derived from years of experience in the particular mining district.

2. SAME—LOCATION—ABANDONMENT—ASSESSMENT WORK.

Although the owner of a location has failed to do the necessary assessment work, so that the ground is subject to a relocation, yet if, before any such relocation by others, he perform the amount of assessment work required by the statute, then his rights are revived, and a subsequent relocation is invalid.

3. SAME—ASSESSMENT WORK—ADJOINING CLAIMS.

Assessment work done upon one of a number of adjoining claims, to the amount required to be done upon all of them for the year, is sufficient to hold all of them, if it be clearly shown that it was intended as the annual assessment work upon all the claims, and that it was of such a character that it would inure to their benefit.

4. SAME—INTERMEDIATE RELOCATIONS—ABANDONMENT.

Where relocations have been made after the owner of the original location has failed beyond the statutory time to do the necessary assessment work, but such relocations are afterwards abandoned, and thereafter the owner of the original location performs assessment work which revives his rights, the fact of such intermediate relocations cannot aid one who subsequently attempts to relocate the same ground.

This is a suit in equity by the Justice Mining Company against John Barclay and others to enjoin the working of a certain mine, situated in the Gold Hill mining district, in Storey county, Nev.

W. E. F. Deal, for complainant.
Alfred Chartz, for respondents.

HAWLEY, District Judge. This is a suit in equity, brought by complainant, to enjoin the respondents from mining, extracting, or removing any quartz rock, earth, or ore from certain mining ground claimed by complainant, situate in the Gold Hill mining district, Storey county, Nev. The complainant is the owner of the Justice patented ground and lode, and of the Woodville patented ground and lode, the surface boundaries of which are delineated upon the following diagram.

The title of complainant to both of these claims as patented is admitted by the respondents, but they deny that either of said lodes includes any part of the mining ground, lode, claim, or premises lying between the easterly side line of the Justice patented claim and the westerly side line of the Woodville patented claim. On April 27, 1895, complainant leased to George Hobart, Charles H. Steele, and respondents Thomas Bell and C. Benham, for the period of one year, the mining ground "commencing at the trestle leading from the Justice Company's tunnel to the Washoe Mill, and running thence in a

southerly direction, following the course of Gold cañon, to the south boundary line of the Justice claim, and extending from the line of the Devil's Gate toll road easterly to the east line of said Justice Mining Company's claim," upon an agreed royalty or percentage of the value of ore extracted. Steele and Hobart testified that, after the lease was executed, the superintendent of the Justice informed them that they could work as far east as the Justice claimed, or as far east as they pleased. Respondents Bell and Benham testified that the lease was only intended for the main Justice lode within the Justice patented lines. The respondents, on January 1, 1896, located certain mining ground, described in the answer as follows:

"Beginning at post No. 1 on the east side line of the mining claim and premises first described in plaintiff's bill of complaint, being what was formerly known as the Justice Independent claim, U. S. survey No. 48, but now known as the Justice claim, from which post No. 7 of the Justice Independent claim bears south, 47° east, 307.1 feet distant; thence, for the first course, north, 41° west, 636.9 feet, to post No. 2, identical with post No. 6 of the U. S. survey No. 48; thence, second course, north, 49° east, 382.7 feet, to post marked No. 3; thence, third course, along the west line of said Woodville claim, south, 10° east, 743 feet, to the place of beginning,—which said last described mining claim and premises is known as and called the Hills Gold and Silver Quartz Mine."

This ground is situate within the triangle shown on the diagram between the Justice and Woodville side lines.

The real contention on the part of the complainant is that the lode located by the respondents has its apex within the patented lines of the Justice claim, and extends downward vertically, entering into the adjoining land located by the respondents. The same contention is made with reference to the Woodville, the theory being that there is but one lode, known as and called the "Comstock Lode." The contention of the respondents is that the Hills Gold and Silver Quartz Mine is upon a separate and independent lode, well defined, between foot and hanging walls, having its apex outside of the surface limits of either the Justice or Woodville patented ground, and solely within the ground located by respondents. This is the principal and most important question in controversy, and upon which there is a decided conflict in the testimony.

It would serve no useful purpose to give the substance of the testimony as to the theory of the witnesses, with the facts upon which their conclusions are based. In all controversies concerning the identity of ore bodies found on different levels at various depths beneath the surface, there is always room for a wide divergence of opinion among men of equal credit and experience as miners. The absolute truth is often difficult to ascertain, except in cases where connections are made between the different bodies of ore found on the different levels; and even then there is often room for controversies unless absolute continuity of vein matter is found, until expensive explorations are made, for the continuity of ore may be broken by the injection of country rock into the vein, or what is known among miners as a "horse" is found, which is not always easily distinguished from the actual walls of country rock. One witness, upon a careful inspection, may be of the opinion that it is the hanging or foot wall of the lode; while another, from

his examination, gives it as his opinion that it is simply a horse, and that further exploration will develop the fact that the different bodies of ore are upon the same vein. A wide latitude is always permissible for the purpose of ascertaining the reasoning upon which the conclusions of witnesses are based, as well as their general knowledge of the ground, their experience and observation, and their qualifications as practical miners or experts, derived from years of experience in the particular district where the ore bodies in question are found. Mining Co. v. Corcoran, 15 Nev. 153; Book v. Mining Co., 58 Fed. 106, 111, 120, 126; Consolidated Wyoming Gold Min. Co. v. Champion Min. Co., 63 Fed. 540, 544. Courts, however, are always inclined to give heed to the actual facts which have been ascertained from the workings at different points on the ground in dispute, and especially at the places where it is claimed on one side and denied by the other that the ore bodies unite. Upon this branch of the case a brief abstract of the testimony is filed herewith, giving a fair outline, in the language of the witnesses, as to their conclusions in relation to the developments actually made in the Steele shaft and in the Hills or Barclay shaft, and the various levels, tunnels, drifts, and inclines connected therewith, and the character of rock, earth, and ore found therein, and particularly upon the point whether the ore found in the ground covered by the Hills location is connected with, and forms a part of, the main Justice lode, which has its apex within the patented ground of the Justice, or is separated therefrom, and belongs to an independent vein or lode, having its apex within the limits of the Hills location, to which reference will hereafter be made.

In support of complainant's right to recover herein, it is alleged in the bill that complainant is the owner of, in possession of, and entitled to the possession of, the mining ground, claim, real estate, and premises lying between the easterly side line of the Justice patented ground and the westerly side line of the Woodville patented ground, together with all the veins of gold and silver bearing quartz rock, the apexes of which are within the surface boundaries of said claim, with the right to follow such veins or lodes to any depth; that while the respondents Charles Benham and Thomas Bell were in possession of and working on the lode within the Justice ground, as tenants of complainant, the other respondents herein, on January 1, 1896, conspired with them, and made a pretended location of a portion of said ground between the Justice and Woodville patented locations in the name of W. P. Hills, but for the use and benefit of the other respondents; that, when said location was made by W. P. Hills, the respondents Benham and Bell were in actual possession of said ground and vein as tenants of complainant, and were working the same for the purpose of complying with the laws of congress with reference to holding, possessing, and working mining claims; and that complainant had every year up to January 1, 1896, done and performed more than $100 worth of work for the purpose of holding and possessing said claim, in accordance and compliance with the provisions of the act of congress in regard thereto. The title of complainant to the particular piece of ground in controversy, independent of any rights it may have by virtue of its ownership in the Justice and Woodville patented ground, is derived from the

mining location made by A. Cummings on the 19th of March, 1875, which included in its description all the ground embraced in the location of the Hills Gold and Silver Quartz Mine. This mining ground was on April 12, 1875, conveyed by deed to the Woodville Con. S. M. Company. In July, 1880, the complainant acquired title to all the mining property of the Woodville Con. S. M. Company, including, among others, the Cummings claim. At this time S. T. Curtis was the superintendent of the complainant, and upon the trial hereof testified that he went upon the ground, and took possession of all the property, including the Cummings claim; that he received a tracing from the company's office in San Francisco of all the claims; that he took the tracing, went upon the ground, and found a great many of the old monuments and stakes. It is claimed by complainant that from that time up to January 1, 1896, when the Hills location was made, it continued to remain in the possession of the ground located by Cummings, and that its possession was open and notorious.

It is shown that respondents, at the time of, or soon after, the Hills location was made, were notified of complainant's claim to the ground, and that they would be held responsible for any damage which they might commit. No work was ever done by the complainant within the surface lines of the Cummings location. But it claims to have expended during the year 1895 over $3,000 for the purpose of holding the Cummings and six other claims, to which it has title. This claim is partly based upon the theory that, inasmuch as the Cummings claim is contiguous to the Justice, work done upon the Justice within its patented lines would inure to the benefit of the Cummings, and constitute compliance with the provisions of the law requiring a certain amount of work upon unpatented claims to be performed every year; and, further, upon the ground that certain work performed by some of the respondents as lessees of complainant was for the purpose of saving it "a cash expenditure of money for the purpose of assessment on the different claims," includir the Cummings; and that this was the principal object of making the lease. It is not claimed that the notice of location of the Cummings claim, as recorded, is not sufficiently descriptive to enable any one to ascertain therefrom what particular ground was claimed thereby. The objection urged against this location is that no evidence was offered that A. Cummings ever made the location, posted the notice, or put any stakes upon the ground, or that he or his grantees or predecessors in interest ever complied with the law requiring annual assessment work to be done upon the location; that the ground was abandoned; that, if not abandoned, it was forfeited; that it was claimed by other parties who had regularly located the ground prior to 1895, but who failed to do the assessment work in 1895; and that the ground was therefore subject to relocation on January 1, 1896, when the Hills location was made. It appears from the evidence that some five or six locations were made at the same time, or about the same time, as the Cummings, all being in proximity with each other. The plain inference to be drawn from all the testimony is that these locations were made at the instance and request and for the use and benefit of the Woodville Company, evidently for the purpose of protecting the Woodville claim. The natural presump-

tion to be drawn from the testimony is that, at the time, the lode or vein, or lodes or veins, if more than one, had not been clearly defined; the explorations and developments that had been made were not sufficient to actually determine whether certain seams of ore which were found in different places constituted different lodes or veins, or were in fact but parts of one lode; and that future workings would demonstrate this to be a fact by absolute continuity and connection of the ore bodies. It is not shown that any work was done by the Woodville Company on any of the six claims independent of the work that was being conducted and carried on by it within the surface limits of the Woodville patented claim. Owing to controversies which thereafter arose between the Justice and the Woodville as to whether both claims were not upon the same lode, or from other causes, the Woodville Company became involved, and all its property, including the Cummings ground, was sold under execution, and the Justice Company thereafter obtained the title to all the property. The Justice never performed any work upon the ground within the surface limits of the Cummings location, or any work for its benefit, save such as was performed in the regular course of work upon the Justice lode within the surface limits of the Justice patented claim. It had a watchman employed to look after its property, including the Justice, Cummings, and Woodville claims, and always asserted and claimed all the ground embraced in said locations and others not involved in this controversy.

It is a well-settled principle of law that abandonment of property is always a question of intention. It is a voluntary act. The property in question was never abandoned by complainant. It always asserted a claim to the ground. There is no evidence in the record which indicates any intention on its part to give up its right to this particular ground. Forfeiture may occur by failure to comply with some positive requirement of the statute, or of the mining rules or regulations, if the statute or rules provide that such failure shall work a forfeiture of the claim. Forfeitures, however, are not, as a general rule, favored by the law. A forfeiture of a mining claim cannot be established except upon clear and convincing proof of the failure of the owners of the claim to have the work done or improvements made to the amount required by law. Hammer v. Milling Co., 130 U. S. 291, 301, 9 Sup. Ct. 548. Conceding, for the purpose of this opinion, that complainant had failed to do any assessment work upon the ground, and that it was, prior to January 1, 1895, subject to be relocated, still the respondents are not in a position to take any advantage of such failure on the part of the complainant to do the assessment work. The evidence is direct and positive that the object of the lease, as executed by complainant, was for the express purpose of performing enough work to hold the Cummings and the other claims lying outside of the patented lines of the Justice and Woodville. This testimony, although criticised and questioned by respondents' counsel, is undisputed. If true, it was sufficient to prevent the respondents from making any valid location in January, 1896. The assessment work by complainant in 1895, prior to the relocation of the grounds by Hills, on behalf of the respondents, and before any intervening rights by other parties had been acquired, revived its rights under the Cummings location; and the ground em-

braced in the Cummings claim could not therefore be considered as forfeited at the time Hills entered upon the ground, and made the location of the Hills Gold and Silver Quartz Mine.

The language of section 2324, Rev. St., is clear, plain, and explicit upon this point. After stating the amount of work that must be annually performed on each claim, it reads as follows:

"But, where such claims are held in common, such expenditure may be made upon any one claim; and, upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure, and before such location."

North Noonday Min. Co. v. Orient Min. Co., 1 Fed. 522, 539; Jupiter Min. Co. v. Bodie Consol. Min. Co., 11 Fed. 668, 681; Lakin v. Mining Co., 25 Fed. 337, 343; Mining Co. v. Deferrari, 62 Cal. 160, 163; Gregory v. Pershbaker, 73 Cal. 109, 119, 14 Pac. 401; Pharis v. Muldoon, 75 Cal. 284, 17 Pac. 70; Belk v. Meagher, 104 U. S. 279, 282.

In order to comply with the law, it was not necessary that the assessment work should be done upon the surface of the claim. It may be done on the surface or beneath the surface, and this would be sufficient although it might be that the work was performed on a lode having its apex outside of such surface lines. Mining Co. v. Callison, 5 Sawy. 439, 456, Fed. Cas. No. 9,886. It may be done on other claims or upon other ground, where, as here, it is in reasonable proximity to it; and if the work, as done, would be beneficial, and tend to the future development or improvement of the claims, it is sufficient. Doherty v. Morris, 17 Colo. 105, 28 Pac. 85; U. S. v. Iron Silver Min. Co., 24 Fed. 568. It has always been held by the supreme court that, when several adjoining claims to mineral lands are held in common, work for the benefit of all done upon any one of them in a given year to an amount equal to that required to be done upon all in that year meets the requirements of section 2324, Rev. St. Smelting Co. v. Kemp, 104 U. S. 636, 655; Jackson v. Roby, 109 U. S. 440, 3 Sup. Ct. 301; Chambers v. Harrington, 111 U. S. 350, 4 Sup. Ct. 428; Book v. Mining Co., 58 Fed. 106, 117; Royston v. Miller, 76 Fed. 50, 52; Eberle v. Carmichael (N. M.) 42 Pac. 95. In Smelting Co. v. Kemp the court said:

"Labor and improvements, within the meaning of the statute, are deemed to have been had on a mining claim, whether it consists of one location or several, when the labor is performed or the improvements are made for its development,—that is, to facilitate the extraction of the metals it may contain,—though in fact such labor and improvements may be on ground which originally constituted only one of the locations, as in sinking a shaft, or be at a distance from the claim itself, as where the labor is performed for the turning of a stream, or the introduction of water, or where the improvement consists in the construction of a flume to carry off the débris or waste material. It would be absurd to require a shaft to be sunk on each location in a consolidated claim, when one shaft would suffice for all the locations."

Some questions are suggested in respondents' brief as to whether the work performed within the patented lines of the Justice could be "harnessed on" to the rule that work might be sufficient if performed in a tunnel run for the purpose of developing a mine, etc. Where the work is not done within the surface boundaries of the location, the law undoubtedly casts the burden upon the party claiming to have

done the work, not only to show that the work done outside of such boundary was intended as the annual assessment work on the claim, but that it was of such a character as that it would inure to the benefit of such claim. But, when such facts are clearly established, then it is wholly immaterial whether the work to accomplish such purpose was performed off the ground upon a patented or unpatented mining claim. Hall v. Kearny, 18 Colo. 505, 509, 33 Pac. 373. The fact that the stakes and monuments, as designated in the notice and shown in the tracings, as seen by Curtis when he took possession of the Cummings ground for the Justice, were not visible at the time of the location of the Hills claim, does not vitiate the Cummings location, if the law in all other essential respects has been complied with. Book v. Mining Co., 58 Fed. 106, 114. The fact that the "Leermo" and "Quinn" locations had been made within the surface boundaries of the Cummings prior to 1895 did not defeat complainant's title to the Cummings. If either of said locations were valid, the respondents would have no standing in court. They do not claim any rights under either of these locations. The proof is that both locations were either forfeited or abandoned, and the evidence in regard to these locations was only admissible as tending to support the theory of the respondents that the triangular space of ground between the Justice and Woodville patented lines was generally considered by the miners as locatable ground, and that respondents, acting upon that belief, were not conspirators, acting in bad faith in making the Hills location.

With reference to complainant's right to the Cummings claim, still treating it to be upon a separate and independent vein from the Woodville and the Justice, there still remains the further question whether the complainant has or has not been in the actual possession of the ground since it acquired title thereto, and was in the actual possession thereof at the time the Hills claim was located. This matter has been incidentally referred to simply to show that complainant had not abandoned the ground, and that it was at all times asserting its rights to and claim of the ground in dispute. Was this a mere bald assertion, a sham, a pretense without any right, a mere bugbear to frighten off all comers? Or was it acting in good faith, under color of right, in the honest belief that it was the owner of the ground? Its asserted claim was made at all times, whenever, wherever, or by whom attacked. The Quinn location was made in July, 1891. John O'Toole, who was interested therein, testified as to what occurred when he and Mr. Quinn commenced work on the location. He said:

"At that time Charles Lyons was superintendent of the Justice, and Charles Lyons notified us that that ground belonged to the Justice, and we told him that we did not think it did, and he said, if we took anything out, he would attach it; and we took out some ore, not a great deal, and we got a little behind, and had no money to do further work, and Lyons was making it kind of interesting, and we thought we had better leave it go, and we quit. We worked until some time in August, I believe, and we quit; and the ore that was there, we left it in the creek, and a freshet came along, and washed it away, and we never got anything out of it. Q. What occurred that made you leave the place? A. It was simply through Lyons talking to us, and telling us that we could not hold it. * * * Mr. Lyons simply told me the ground belonged to the Justice Company, and if we worked it, and took anything out, he would take it from us."

82 F.—36

Altoona Q. M. Co. v. Integral Q. M. Co. (Cal.) 45 Pac. 1047, 1049, is cited by respondents as establishing the proposition that:

"If there was only the naked claim to be looked after, and a watchman were placed there merely to warn prospectors, and thus prevent a relocation, it would not be labor upon the mine, in the sense of the statute."

It is shown, however, that the complainant performed the necessary amount of work in 1895. The presence of the watchman shows, or tends to show, the actual possession of the ground by complainant, and that such possession was open and notorious.

These results, as to the acts of the complainant and its good faith with reference to its ownership of the ground embraced in the Cummings claim, taken in connection with all the circumstances under which respondents Bell and Benham took the lease, coupled, as it must be, with the further condition that, while working under the lease as tenants of complainant, they discovered the ore body in dispute, lead to the conclusion that complainant has established a better right and superior title to the mining ground in question than the respondents. But the judgment in this case need not be based solely upon this ground. The same result would probably be reached upon the theory that there is but one vein or lode within the Justice or Woodville patented lines, and that the ore extracted by the respondents was from that lode. But, be that as it may, after a careful review and consideration of all the evidence, I am clearly of opinion that the decided weight and preponderance of evidence upon the facts, shown by the developments as made in the Steele shaft and the Hills or Barclay shaft, with the different levels, tunnels, drifts, and inclines connected therewith, is to the effect that the ore body, seam, or vein disclosed in respondents' workings is a part of, and is connected in vein matter with, the Justice lode, having its apex within the patented lines of the Justice. Let a decree be drawn in favor of complainant, in accordance with the views herein expressed.