656 P.2d 600

**PUBLIC SERVICE COMPANY OF OKLAHOMA, a corporation; Getty Oil Company, a corporation; Beall J. Masterson and Anita Masterson, husband and wife, Plaintiffs-Appellees,**

v.

**Floyd R. BLEAK and Clyda Bleak, husband and wife; Leo Crowley and Mary Ellen Crowley, husband and wife; and Leo F. Childs, Defendants-Appellants,**

**and**

**Berthal W. Trent and Joyce Trent, husband and wife, Defendants.**

**No. 15662.**

Supreme Court of Arizona, In Division.

Dec. 30, 1982.

Law Offices of Kenneth L. Allen by Kenneth L. Allen, Ilene G. Sipe, Tucson, and DeConcini, McDonald, Brammer, Yetwin & Lacy by John C. Lacy, Tucson, for plaintiffs-appellees.

Crowley, Fresquez & Fresquez by Leo Crowley, Flagstaff, for defendants-appellants.

FELDMAN, Justice.

Plaintiffs, Getty Oil Company (Getty). Public Service Company of Oklahoma (Public Service) and Beall J. Masterson, brought this action to establish their possessory rights to a number of unpatented mining claims. Following a jury trial, a verdict was returned in favor of plaintiffs and

judgment was entered that plaintiffs were entitled to exclusive possession of the claims as against the defendants, Floyd and Clyda Bleak (Bleak), Berthel and Joyce Trent, Leo and Mary Ellen Crowley, and Leo F. Childs. Defendants appeal from the judgment and the denial of their motion for a new trial. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and Ariz.R.Civ. App.P. 19(e), 17A A.R.S. We affirm.

## FACTS

The unpatented mining claims in question are located in Mohave County near Artillery Peak. The area was first recognized as having potential for uranium mineralization in 1955. Beall J. Masterson and his family located ten claims in July, 1955. Later that same year, James Saunders and his wife entered the area and began staking unpatented mining claims to the south and east of the Masterson claim group. In February, 1956, Tejano Mines, a limited partnership, through Beura Childs, one of the partners, began locating claims to the south of the Masterson claims. In March, 1956, Saunders and Tejano Mines entered into a written agreement by which they agreed to work together on their group of claims, all of which were located south and east of the Masterson claims. The parties stipulated that these original claims were made on unappropriated ground.

Eventually there was a falling out between the Saunders and Tejano groups, and there is conflicting evidence on the question of whether any work was done on the joint Saunders-Tejano claims for a period of approximately thirteen years from 1958 through 1971. In the midst of this period, in May, 1968, Hecla Mining Company entered the area, inspected the ground and the records, and eventually located 59 claims, known as the J.L. claims. These claims overlaid a substantial portion of the claims filed by the Saunders and Tejano groups in 1955 and 1956. At trial, the parties stipulated that Hecla's locations were made in good faith. There was testimony that Hecla's employees never observed any indication of active conflicting claims. Hecla did not perform the annual assessment work for the assessment year ending September 1, 1972.

In 1971, Floyd Bleak appeared on the scene and purportedly entered into an agreement with Saunders whereby Bleak was to relocate part of the Saunders-Tejano claims and take over the assessment work on all the claims. Bleak was to pay Saunders a percentage of the net proceeds from the sale or operation of the claims. On May 1, 1971, Bleak attempted to locate (in the name of Berthel Trent) the Big Sandys # 1 through # 15 and # 18 through # 51. The physical location of these claims was in dispute.

Between July of 1973 and September of 1974, Getty and Public Service entered the area. Getty leased the Masterson claims. It also staked lode-mining claims called Hots # 1 through # 46. Public Service located claims known as A.P.s # 1 through # 44. This work was done as part of a joint venture between Getty and Public Service. The Getty-Public Service claims completely overlay the area and are in direct conflict with the Saunders-Tejano claims. They also overlay, in part at least, Bleak's Big Sandy claims.

The chief factual issue in the case revolves around the question of whether Bleak had actually done the work necessary to perfect valid locations of the Big Sandy claims, and, if he had, whether he had done the annual assessment work required to retain his possessory rights to all of the claims, including the Saunders-Tejano group. Bleak testified to having done the necessary work, while representatives of both Getty and Public Service testified that they had searched the area prior to location and found no evidence of conflicting claims or recent assessment work. They testified that the Getty and Public Service claims were located in good faith without knowledge of any conflicting claims. To bolster this position, they testified that Getty and Public Service employees had checked with people in the area and found that none of the local residents had knowledge of any conflicting claims and that none had seen

any recent work in the area. A search of the public records had also failed to show any evidence of active conflicting claims.

In May, 1977, Getty and Public Service first became aware of Bleak's claim of a possessory right to both the Saunders-Tejano claims and the Big Sandy claims. As a result of Bleak's claims, plaintiffs brought this possessory action to establish their exclusive right of possession to the Masterson claims, the Hots # 1 through # 46 and the A.P.s # 1 through # 44. The defendants [1] sought judgment that the Saunders-Tejano and Big Sandy claims entitled them to a prior right of possession wherever there were conflicts with the plaintiffs' group of claims.

At trial, the parties stipulated that a valid discovery of minerals was made on all claims and that all acts necessary for valid locations were performed on all claims except the 1971 Big Sandys.

Defendants raise several assignments of error dealing with instructions and evidentiary rulings and also allege that the verdict was contrary to the weight of the evidence. Further facts will be given where appropriate in discussion of the legal issues raised by this appeal.

## INSTRUCTIONS

### Effect of Forfeiture

■■ The primary legal issue raised by this appeal is whether the Saunders-Tejano possessory right was revived when, and if, Bleak resumed assessment work on those claims following the forfeiture resulting from the failure of Saunders and Childs to do the assessment work and the subsequent location and abandonment of the claims by Hecla. Plaintiffs claimed that when Childs and Saunders failed to perform their assessment work, their claims became subject to location by a new locator. This is a correct statement of the law. 30 U.S.C. § 28 (1976). Plaintiffs next claim that Hecla's

location therefore terminated the Saunders-Childs possessory rights. This, too, is a correct statement of the law. *Id.* Plaintiffs then argue that when Hecla abandoned the claims which it had located over the Saunders-Tejano claims, the mineral deposits became subject to new location, even though Bleak may have reentered on behalf of Saunders and Childs and resumed the assessment work. Under plaintiffs' theory, Bleak could reacquire exclusive possession only by making a new location. Defendants claim, however, that when Hecla abandoned the claims Bleak's resumption of assessment work reinstated his exclusive possessory rights and prevented valid locations by any of the plaintiffs.

This legal dispute was resolved in plaintiffs' favor by the trial court, which put the principle to the jury in the following instruction:

> Where the senior locator of a mining claim has failed to do the required assessment work and the claim is relocated by a second locator who later abandons the claim or fails to do the assessment work, the senior locator may not resume assessment work and prevent the relocation of the claim by a third locator.

Defendants argue on appeal that this instruction is an incorrect statement of the law. There are conflicting views on this issue.

■ The right created by the valid location of an unpatented mining claim is a right of exclusive possession. *Malone v. Jackson,* 137 F. 878 (9th Cir.1905). The right is merely a possessory right because title to the property remains in the United States until the claim is patented. *Bagg v. New Jersey Loan Co.,* 88 Ariz. 182, 188–89, 354 P.2d 40, 44 (1960). To maintain the right of exclusive possession, the locator of a claim must perform annual labor or "assessment work" on the claim. 30 U.S.C. § 28 (1976).

---

1. Beura Childs died in 1966, James Saunders died in 1973. In 1977, Bleak acquired quit claim deeds of several claims in the Saunders-Tejano group from Cheri Saunders, the widow of James Saunders, and Leo F. Childs, general partner in Tejano Mines. Leo Crowley acquired a share of Bleak's rights in 1977.

■ The failure to perform annual assessment work does not in itself work a forfeiture of a locator's possessory right, but the statute provides that:

> [U]pon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location.

*Id.*

■ Thus the statute allows an original locator who has "defaulted" in his annual labor to retain his possessory right by resuming that labor before a subsequent location is made. If a subsequent relocation is made before the assessment work is resumed, the land is open and unappropriated and is subject to relocation "in the same manner as if no location of the same had ever been made."

■ The statute is silent with regard to what occurs when a valid subsequent relocation is made, but abandoned, and the original locator then resumes assessment work. Three cases hold that in such a situation the original relocator revives his right to exclusive possession by resuming assessment work. *Justice Mining Co. v. Barclay,* 82 F. 554 (D.Nev.1897); *Richen v. Davis,* 76 Or. 311, 148 P. 1130 (1915); *Klopenstine v. Hays,* 20 Utah 45, 57 P. 712 (1899). Two cases hold that when the claim was validly relocated because of the original locator's failure to do the assessment work, the possessory right of the original locator cannot be revived by resumption of assessment work, despite the fact that the intervening locator abandoned the claim or failed to do the assessment work. *Florence-Rae Copper Co. v. Kimbel,* 85 Wash. 162, 147 P. 881 (1915); *Knutson v. Fredlund,* 56 Wash. 634, 106 P. 200 (1910).

The latter view has been adopted by the Rocky Mountain Mineral Foundation. 2 *American Law of Mining* § 8.7H (1960). The leading authority on mining law also supports this view:

In the case of *Justice Mining Co. v. Barclay,* Judge Hawley expressed the view that where relocations have been made after the owner of the original location has failed beyond the statutory time to do the necessary assessment work, but such relocations are afterward abandoned, and thereafter the owner of the original location performs assessment work *which revives his rights,* the fact of such intermediate relocations cannot aid one who [like plaintiffs in the case at bench] subsequently attempts to relocate the same ground. These views were quoted with approval by the Supreme Court of Utah. This is not altogether consistent with the theory that after a valid relocation has once been made the rights of the original locator have been completely lost. Yet the effect given to the relocation under the statute is that of an original location, —the same "as if no location of the same had ever been made." If after intervening valid relocations are made, and become subject to forfeiture, the original owner may, by simply resuming work, reinstate his original *status,* his original estate must simply have been in suspense during the period when the ground was covered by valid relocations. It seems to us that the new entry of the relocator terminates the estate of the original locator, and in turn the estate of the relocator can only be divested by a new entry and a new location.

2 C. Lindley, *Lindley on Mines* § 651, at 1632–33 (3d ed. 1914) (emphasis in original; footnotes omitted).

Lindley also states that when there has been a valid relocation because of the failure of the original locator to perform his assessment work, the relocation effects a forfeiture of the estate of the original locator and that "estate . . . is hopelessly lost, and there is no possibility of its being restored" absent a new location by the original locator. *Id.* at 1631.

■■ We believe that the position of the Washington cases, the Rocky Mountain Mineral Foundation, and Lindley is the bet-

ter rule. It is in accord with the plain language and objectives of the statute. We recognize that the law abhors forfeiture, but once a forfeiture occurs—here by the words of the statute—the requirement of certainty, necessary for the orderly development of mineral resources, prevails.[2] The rule that an original locator could revive his exclusive right to possession without making a relocation would place unrealistic demands on third parties attempting to determine whether mineral land is open to location. We therefore adopt as our rule the principle that upon relocation for failure of the original locator to do his assessment work, the possessory right of the original locator is forfeited and cannot be revived by resumption of assessment work. Upon location and subsequent abandonment by an intervening locator, the ground is open and available for location. The trial court did not err, therefore, in giving the instruction.

### Resumption of Assessment Work

Some of the Saunders-Tejano claims were not covered by Hecla's intervening location, but were covered by later locations of Getty and Public Service. Defendants claim that Bleak had resumed assessment work on behalf of Saunders and Childs on these claims prior to the location by plaintiffs. Plaintiffs contend, on the other hand, that Bleak did not resume assessment work and that if he did any work, it was not sufficient or proper to qualify as "annual labor." The trial court instructed the jury that:

> The one resuming the work must intend such work to be a resumption of the assessment work on such claims and the work performed must constitute an outward manifestation to resume such work and the person must in fact perform such work on or for the benefit of such claims and the work performed must be proper assessment work.

2. We recognize that present circumstances have led to considerable controversy over the general policy encouraging development of mineral land. The wisdom of that policy is a legislative question. We are bound by the acknowledged objectives of the Congress in

■ Defendants objected to the portion of the instruction which stated that the work "must constitute an outward manifestation to resume such work." Defendants argue that *any* work which would qualify as assessment work is sufficient, even if there is no physical manifestation of the work. The defendants argue that, for example, taking samples and performing assay analyses of the samples qualifies as a resumption of assessment work. Defendant is correct that taking samples and performing assay analyses can qualify as assessment work. 43 C.F.R. § 3851.2 (1981). The instruction, however, did not indicate to the contrary and did not require a *physical* manifestation of the work on the land. It did require "an *outward* manifestation," and this is a correct statement of the law. Assessment work means the *performance of some act,* rather than the mere intention or preparation to act. *See* 2 Lindley, *supra* §§ 652–654.

■ The instructions correctly informed the jury that proper assessment work could consist of "the performance of labor or the making of improvements on *or for the benefit* of a mining claim." (Emphasis supplied.) Clearly, the instruction did not restrict assessment work to that which results in a physical manifestation *on* the land. Viewing the instruction in question as a whole, we find that the rules of law applicable to this case were correctly stated and the instruction was not erroneous.

### Presumptions

Defendants allege that the court erred in refusing to give defendants' requested instruction which stated:

> A senior locator of a mining claim who is in possession is entitled to certain presumptions as against a junior locator. The law presumes that the senior locator is the owner of his claims under valid

adopting the statute under consideration. That objective was to encourage the speedy and orderly exploration and development of the mineral resources of our country. *Bagg v. New Jersey Loan Co.,* 88 Ariz. at 190, 354 P.2d at 45.

locations. This means a junior locator must prove both the validity of his own claims and the invalidity of the senior locator's claims. A party is deemed "in possession" if he has performed annual assessment work for the preceding year (ending on September 1) prior to the year (beginning on September 1) in which a junior locator's claims were located. A senior locator may rely upon this presumption of ownership in sustaining his burden of proof. *Moreover, you should view the evidence of a senior locator in possession in the most favorable light it will justify.*

(Emphasis supplied.)

The language of the instruction is taken from *Bagg v. New Jersey Loan Co., supra.* Even assuming, without deciding, that the presumption which favors a senior locator survives evidence of abandonment or forfeiture of the senior locator's possessory right,[3] we hold that there was no error in refusing the instruction because the emphasized portion of that instruction was a comment on the evidence.

 The Arizona Constitution, art. 6, § 27, in pertinent part, provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." In applying this rule we have stated that the Constitution forbids the court singling out and making unduly prominent some parts of the evidence. If an instruction has the effect of indicating to the jury that the court attached any special importance to particular testimony or parts of the evidence, it is an invasion of the province of the jury. *Allen v. State*, 26 Ariz. 317, 323, 225 P. 332, 333–34 (1924); *Babb v. State*, 18 Ariz. 505, 511, 163 P. 259, 261 (1917). An instruction which authorizes the jury to consider the comparative weight of particular evidence and implies that its value is to be tested by a rule different from that applicable to other evidence is an improper comment on the evidence. *State*

*v. Miller*, 62 Ariz. 529, 533, 158 P.2d 669, 670 (1945).

 The emphasized portion of the instruction at issue clearly violated these rules and would have constituted an improper comment on the evidence. If a requested instruction is partly correct and partly incorrect, it is not the duty of the trial court to "separate the sheep from the goats" and the entire instruction may be properly refused. *Powell v. Langford*, 58 Ariz. 281, 288, 119 P.2d 230, 233 (1941); *Porterie v. Peters*, 111 Ariz. 452, 455, 532 P.2d 514, 517 (1975). We find, therefore, that the trial court did not err in refusing to give the requested instruction.

### Relocation-Intent not to Abandon

Defendants' last contention of error on the instructions is that the court erred in refusing to give their requested instruction which read as follows:

An attempt by a senior locator to relocate a claim or claims is evidence of his intent not to abandon the claim, but to hold it. Likewise, such an attempt to relocate does not constitute a forfeiture which a third party can take advantage of if the original locator resumes work on the claim in good faith.

Defendants claim that the refusal to give the quoted instruction denied them a critical argument that Bleak's attempt to relocate claims was evidence that he had not previously intended to abandon the claims.

Defendants argue the instruction in question is supported by the cases of *Hartman Gold Mining Co. v. Warning*, 40 Ariz. 267, 11 P.2d 854 (1932), and *Peachy v. Gaddis*, 14 Ariz. 214, 127 P. 739 (1912). However, there is a critical difference between the facts of the cases cited and the facts in the case at bench. In the cited cases, the instruction was given upon evidence which established that the senior locator had relocated or attempted to relocate his claims over and on the site of the original claims.

3. See 1 M. Udall & J. Livermore, Arizona Practice, *Law of Evidence* § 143, at 324 (2d ed. 1982) for discussion of problems involved in jury instruction on presumptions and the question of whether a presumption affects the burden of proof or merely the burden of going forward with the evidence.

In *Peachy,* the court stated that the defaulting locators "went upon the ground, and attempted to relocate the *exact* ground covered by the original locations, thus, in a most convincing way, showing a disposition not to abandon the mining ground they and their predecessors had possessed . . . ." *Id.* at 218, 127 P. at 741. (Emphasis supplied.)

In the case at bench, however, the relocation made by Bleak was not upon the exact ground covered by the original locations, but was, rather, located one-half mile away. Bleak contends that this discrepancy was due to a faulty compass. It could be argued, however, that relocation one-half mile away is a much less convincing showing of an intent not to abandon the original claims than relocation on the exact location of the original claims, so that the instruction would have been inappropriate under the facts of the case.

We need not resolve this question, since we find that Bleak was not prejudiced by the refusal to give this instruction. The court did instruct the jury in the following words:

An unsuccessful relocation by a mining claimant is not necessarily an abandonment of the claimant's rights under the prior location.

Defendants' contention was adequately expressed in the instruction which was given. Thus, the refusal of the requested instruction was not error because the concept contained therein was adequately covered through the instruction which was given. *Brierley v. Anaconda Co.,* 111 Ariz. 8, 12, 522 P.2d 1085, 1089 (1974).

## HEARSAY

At trial, Alan Disbrow, a geologist for Hecla Mining Company, was allowed to testify, over defendants' objection, about statements made by John Love, a longtime resident of the Artillery Peak area. Disbrow testified that in 1967, during his exploration of the Artillery Peak area for Hecla, he contacted Love regarding mining activity in the area. Disbrow testified in substance that Love told him that Masterson's property had been leased and that

people had been working on it, but that he was not aware that work had been done on any of the other properties in the area.

Defendants argue that these statements were hearsay. Defendants point out that the parties had stipulated that Hecla had acted in good faith in locating its mining claims and that therefore the evidence served no non-hearsay purpose.

Plaintiffs argue, however, that while the good faith of Hecla was not at issue, the good faith of Getty and Public Service was in dispute. Plaintiffs allege that Getty and Public Service relied on information from Hecla when locating their claims. They argue, therefore, that the Love statements were not offered to prove the truth of the facts asserted, but, rather, to show the good faith of Getty and Public Service.

Good faith is a prerequisite to a valid location of an unpatented mining claim. *Union Oil Co. of California v. Smith,* 249 U.S. 337, 346, 39 S.Ct. 308, 310, 63 L.Ed. 635 (1919); *Geomet Exploration, Ltd. v. Lucky Mc Uranium Corp.,* 124 Ariz. 55, 59, 601 P.2d 1339, 1343 (1979). This court has defined good faith as "honesty of purpose and absence of intent to defraud." *Geomet, supra.* A locator's knowledge regarding previous claims is an element which can be considered in the determination of good faith. *See Geomet, supra.*

It is a well recognized principle that "[w]henever an utterance is offered to evidence the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the hearsay rule is concerned." 6 J. Wigmore, *Wigmore on Evidence* § 1789, at 314 (Chadbourn rev. 1976); *see In re Estate of Sorrells,* 58 Ariz. 25, 36–37, 117 P.2d 96, 101 (1941). Thus, words offered as evidence of an utterance which caused a state of mind in the listener are not within the proscription of Ariz.R.Evid. 802, since they are not offered for a hearsay purpose.

The value of the evidence in such cases does not depend on the truth of the words, but is relevant to prove the motive or the reasonableness of conduct of the person receiving the communication. 1 M. Udall & J. Livermore, *supra* § 122, at 238.

■ Thus the statement would have been admissible as non-hearsay to show the good faith of Getty and Public Service if the statement had been made to one of their employees. In this case, however, the necessary testimonial foundation was lacking. There was no evidence in the record that Love's statement was ever relayed to Public Service or Getty or that it was ever received by any of their employees. There is evidence that Getty and Public Service communicated with Hecla and received reports and information from it regarding the claims, but we find nothing in the record which shows any specific reference to the Love statement. Without such foundation, the statement is not probative for any non-hearsay use and should not have been admitted.

We find, however, that the defendants were not prejudiced by the admission of the hearsay statements. The first part of the statement informed the jury only that Masterson's claims had been leased and worked. These facts were uncontroverted. Erroneous admission of hearsay evidence will not ordinarily be prejudicial where the facts thereby admitted are not controverted. *State v. Williams*, 133 Ariz. 220, 650 P.2d 1202 (1982). The second part of the statement erroneously put in evidence Love's statement that to his knowledge nothing had been done on the other properties, thereby permitting an inference that Saunders and Childs had not done their assessment work. The question of prejudice cannot be determined without reference to the entire record. For several reasons, we hold this statement was also nonprejudicial.

First, there was no evidence at all that the assessment work had been done, except that like Love, Saunders and Childs were allowed to speak from the grave and testify to having done the work. This testimony was "relayed" through various defense witnesses who testified that Saunders, who died in 1973, and Childs, who died in 1966, had told them that the work had been done.[4] The record, however, reveals no witnesses who testified based on personal knowledge that Saunders and Childs had done the assessment work they claimed.

Second, Masterson testified to his observations of the area of the Saunders-Tejano claims and stated in the ten years prior to Hecla's 1968 locations, everybody had lost interest in the area. This testimony was uncontradicted. Disbrow testified that his physical examination of the area had revealed no indication of assessment work on the Saunders-Tejano claims for some time.

Third, testimony was permitted from Getty-Public Service employee Milliken that he had talked to Love regarding the non-performance of assessment work on the Saunders-Tejano claims. Love's statement to Milliken was properly admitted in evidence on the question of the good faith of Getty and Public Service in making their locations which overlaid the Saunders-Tejano claims. The question of good faith on the part of Getty and Public Service was not the subject of stipulation and was in issue. This testimony, therefore, was properly admitted for the non-hearsay purpose of showing the reliance and resultant good faith of Getty and Public Service in making their locations. Ariz.R.Evid. 801(d); 1 M. Udall & Livermore, *supra*. The Love-Milliken statement which was properly admitted was more detailed, explicit and damaging to defendants than the Love-Disbrow statement which was improperly admitted.[5]

---

4. There is no issue raised in this appeal regarding the declarations of Saunders and Childs. These declarations, in any event, were probably admissible for the non-hearsay purpose of showing the declarants' state of mind not to abandon their claims but not for the purpose of proving the truth of the words—that Saunders and Childs had done their assessment work.

5. In admitting the Love-Milliken statement, the trial court gave the jury a limiting instruction, informing them that the evidence was not to be used on the substantive issue of whether Saun-

Considering all of the foregoing circumstances, it is obvious that the second half of the Love-Disbrow statement was merely cumulative to other evidence properly admitted and was therefore not prejudicial error. *State v. Williams, supra.*

## IMPEACHMENT PROBLEMS

Defendants next contend that the trial court erred in admitting exhibits and testimony which were characterized as impeachment. The exhibits in question consisted of assessment affidavits which had been made by Defendant Bleak with regard to claims not involved in the case at bench and a publication of a United States Geological Survey which concerned surface water flow in Arizona during the year 1976. The testimony which was allegedly improperly admitted was that of a hydrologist, Leonard Halpenny.

Defendants claim that the exhibits and the Halpenny testimony were not proper impeachment and that the exhibits and Halpenny's testimony had not been properly disclosed prior to trial because they had not been listed in the pretrial statements required by Rule VI(a), Uniform Rules of Practice of the Superior Court.

### Assessment Affidavits

■ One of the key issues in the case was whether Bleak had done the annual assessment work required to maintain his possessory right to the various mining claims. A.R.S. § 27–208 allows a locator to file and record an affidavit that the required assessment work has been performed. The statute does not require the filing of such an affidavit, but provides that if filed, the affidavit is prima facie evidence of the performance of assessment work. A.R.S. § 27–208(B). When the locator does not file affidavits, no presumption arises and the locator must prove the required annual assessment work without benefit of the statutory presumption.

ders and Childs had actually done their assessment work, but only for the non-hearsay purpose of showing whether Getty and Public Service had believed that the assessment work had not been performed and had, therefore, relocated in good faith. No such limiting instruction

Bleak testified on direct examination that he had done the assessment work for the years 1971 to 1976, but that he had filed no assessment affidavits on the property until 1977 because of his fear that people would learn there was activity in the area and claim jumpers would descend upon the property. On cross-examination, Bleak testified that it had been his practice in uranium mining not to file assessment affidavits because of his fear of claim jumpers. The following question and answer appear in the record:

Q. Therefore, it's your practice as a practical miner, experienced in these fields in this area and because of this fear, that you do not in fact file affidavits of assessment work for that purpose?

A. Yes.

Later in cross-examination, plaintiffs offered in evidence copies of assessment affidavits Bleak had filed with respect to other uranium claims, beginning with the years 1967 and 1968. These claims were unrelated to the properties in issue, but were admitted as impeachment of Bleak's testimony that it was his practice not to file assessment affidavits on any uranium claim.

■ Defendants make a three-fold attack on the admission of the assessment affidavits. They argue first that the affidavits were not relevant and were not properly admitted as impeachment material. We disagree. Evidence of prior inconsistent conduct may be used to impeach.

A witness may always be impeached by a showing that, at other times, he has made oral or written statements, inconsistent with his present testimony . . . . While the form of impeachment most often involves prior oral or written statements, prior inconsistent conduct may also be used to impeach.

1 M. Udall & J. Livermore, *supra* § 43, at 72 (footnotes omitted).

was given with regard to the Love-Disbrow statement. Nevertheless, from a practical viewpoint the effect of the Love-Disbrow statement was obviously reduced by the simple fact that the jury learned the details of Love's observations from the Love-Milliken statement.

Thus, where there is evidence that a party's acts are inconsistent with his testimony on direct examination, evidence of such prior acts is admissible to impeach or discredit the testimony. *State v. Hannon,* 5 Ariz. App. 291, 293, 425 P.2d 861, 863 (1967).

■ Defendant next claims that if the affidavits were admitted for impeachment, it was impeachment on collateral matters and therefore improper. Again, we disagree. It is true that a witness cannot be impeached on collateral matters. *Montano v. Scottsdale Baptist Hospital, Inc.* 119 Ariz. 448, 453, 581 P.2d 682, 687 (1978). There are various tests to determine whether a matter is collateral. One formulation of the test is "could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?" *State v. McGuire,* 113 Ariz. 372, 373, 555 P.2d 330, 331 (1976) (quoting 3A Wigmore, *Wigmore on Evidence* § 1003 (Chadbourn rev. 1970)). One of the main issues in this trial concerned the performance of assessment work. Bleak's statement that his general practice was not to file assessment affidavits was relevant to that issue. While the affidavits pertaining to other properties would not in themselves be independently admissible, Bleak's explanation regarding his failure to file assessment affidavits on the claims in controversy was important evidence, was independently admissible, and the contradiction by producing Bleak's affidavits of assessment work on other property was a direct attack on his credibility.

Essentially the rule is that contradiction to impeach is permissible if it relates to facts relevant, that is not collateral, to the issues in the case. This rule is one of judicial economy. Much irrelevant testimony slips in during a trial. To allow litigation to arise over every such statement for impeachment purposes would be to protract trials unbearably. And, of course, if the rule were otherwise the cross-examiner would be tempted to lengthen his examination in the hope of eliciting a statement which he could contradict. Accordingly, the discretion of the trial court to keep the proceedings within control is well-established.

1 M. Udall & J. Livermore, *supra* § 44, at 76–77 (footnotes omitted).

■ The contradiction by production of the affidavits in question was not over a trivial matter and did not result in such a protraction of the trial that we can say that the trial court acted improperly in admitting the evidence to contradict Bleak's testimony that it was his general practice not to file affidavits. We hold, therefore, that admission of the assessment affidavits did not constitute impeachment on a collateral matter.

Defendant next claims that the trial court erred in admitting the assessment affidavits even if they were proper impeachment, because they were not used solely for impeachment and therefore should have been disclosed prior to trial pursuant to Rule VI, Uniform Rules of the Superior Court. Rule VI(a)(1) requires that a pretrial statement be filed which shall contain a list of exhibits to be offered at trial. The assessment affidavits here were not listed in the pretrial statement. The seminal case in this area is *Zimmerman v. Superior Court,* 98 Ariz. 85, 402 P.2d 212 (1965). In *Zimmerman,* the issue was whether surveillance films of the plaintiff in a personal injury action were immune from discovery. The defendants in the case argued that to allow discovery would violate the spirit of Rule VI(b) which allowed counsel not to disclose exhibits or witnesses which were to be used solely for impeachment.[6] The court stated that to interpret Rule VI to give broad protection to that class of evidence generally described as impeachment would be to subvert the discovery procedures of the Rules of Civil Procedure. *Id.* at 92, 402 P.2d at 217. The court held:

> [W]e interpret Uniform Rule VI(b) and (f) . . . to allow counsel not to disclose

---

**6.** Rule VI has been amended since *Zimmerman.* Impeachment evidence need not be listed in the pretrial statement under Rule VI(a)(1), but must be sealed and filed with the clerk of the court under Rule VI(a)(7).

exhibits which he is going to use solely for impeachment purposes which would not be within the scope of discovery as defined by Rule 26(b) .... We think this interpretation is the only one consonant with the spirit of our discovery rules.

*Id.* at 92–93, 402 P.2d at 217.

■ The scope of discovery under Rule 26 is "any matter, not privileged, which is relevant to the subject matter involved in the pending action" or which "appears reasonably calculated to lead to the discovery of admissible evidence." The assessment affidavits pertaining to property not connected in any way to the matters litigated in the subject case were not matters "involved in the pending action" nor were they "matters reasonably calculated to lead to the discovery of admissible evidence." Under the *Zimmerman* rule, therefore, the trial court committed no error in permitting the use of the affidavits even though they had not been set forth in the exhibit list required by Rule VI(a)(1) of the Uniform Rules of Practice.

### The Big Sandy Issue

Bleak testified that on February 7 through 11 of 1976 he had done 70 hours of assessment work on the PieceMaker claims which were overlaid in whole or in part by the Getty and Public Service claims. He also testified that in 1973 he had begun to travel to the claims by driving his tractor up the Big Sandy River and through February of 1976 had not changed his route to reach the claims in order to do assessment work. On rebuttal, over defendants' objection, plaintiffs called Leonard Halpenny, a hydrologist, as an expert witness. Basing his testimony in part on the statistics contained in the geological survey report and upon his knowledge of the area, Halpenny testified regarding the water flow in the Big Sandy River between the dates of February 7 and February 11, 1976. Halpenny's testimony was to the effect that the water flow in the river on the dates in question ranged from one foot in depth to more than five feet in depth, thus forming the basis of plaintiffs' argument that if Bleak had driven up the Big Sandy to do the assessment work during these dates, he must have floated his tractor on pontoons.

Again, neither Halpenny nor the geological survey report were listed in the pretrial statement, despite the requirements of Rule VI(a)(1) that all witnesses and exhibits be listed and exchanged.

Defendants make the same arguments regarding collateral impeachment and the failure to list Halpenny and the geological survey exhibit in the pretrial statement as they made with regard to the assessment affidavits. Again, we disagree and find that the trial court committed no error.

Defendants allege that plaintiffs' evidence merely contradicted Bleak's testimony and was not impeachment. This is not correct. Impeachment by contradiction is a well-recognized practice. 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 607[05], at 607–61–62 (1981). Again the general rule is that a witness cannot be impeached by contradiction as to collateral matters. *Montano v. Scottsdale Baptist Hospital, Inc., supra.* As we stated in the discussion on the assessment affidavits, one test to determine if an issue is collateral turns on the independent admissibility of the evidence. *State v. McGuire, supra.* Neither the primary fact of what route Bleak followed nor of the water flow in the river would have been necessarily independently admissible, so that test is inapplicable to this evidence. There are, however, situations where contradiction evidence, though not independently relevant, is admissible:

Suppose a witness has told a story of a transaction crucial to the controversy. To prove him wrong in some trivial detail of time, place or circumstance is "collateral." But to prove untrue some fact recited by the witness that if he were really there and saw what he claims to have seen, he could not have been mistaken about, is a convincing kind of impeachment that the courts must make place for, although the contradiction evidence is otherwise inadmissible because it is collateral under the tests mentioned above.

To disprove such a fact is to pull out the linchpin of the story. So we may recognize this third type of allowable contradiction of any part of the witness's account of the background and circumstances of a material transaction, which as a matter of human experience he would not have been mistaken about if his story were true.

1 M. Udall & J. Livermore, *supra* § 44, at 77–78 (quoting C. McCormick, *Evidence* § 47, at 99 (E. Cleary ed. 1972)).

■ The evidence regarding the flow of the Big Sandy tended to impeach Bleak's testimony that he had driven his tractor up the river to get to the claims and was properly admissible as impeachment of Bleak's testimony that he did the assessment work. It was not impeachment on "some trivial detail"; rather it was proof of the type of fact which tended to "pull out the linchpin of the story." It was therefore not impeachment on a collateral matter.

■ · Halpenny's evidence was not required to be listed in the pretrial statement under the rule of *Zimmerman v. Superior Court, supra,* because absent Bleak's testimony of how he got to the claims to do his assessment work, the flow of the Big Sandy River would not have been independently admissible or relevant evidence, and would not have been calculated to lead to such evidence. We find, therefore, that the trial court did not err in permitting Halpenny to testify despite the fact that neither he nor the geological survey report on which he relied for his testimony were listed in the pretrial statement.[7]

■ Defendants' final attack on Halpenny's testimony regarding the flow of the Big Sandy is based on the facts that neither Halpenny nor the survey report were mentioned on plaintiffs' list of impeachment witnesses and exhibits on the pretrial state-ment. Uniform Rule VI(a)(7) required that the pretrial statement indicate that "exhibits and names of witnesses to be used for impeachment have been sealed and filed with the clerk of the court." The rule does not require that such names and witnesses be revealed to the other parties. Plaintiffs did seal and file a list of impeachment witnesses and exhibits. When the seal was broken and the list opened at the trial, it was discovered that plaintiffs' impeachment list included the entry "Corps of Engineers re Big Sandy floods from 71 to 77", but not Halpenny or the survey report.

Since Halpenny was not an employee of the Corps of Engineers, and the survey report had been published by the United States Geological Survey rather than by the Corps of Engineers, defendant objected to Halpenny's testimony, relying upon the last sentence of Uniform Rule VI(a). That sentence reads as follows:

No other exhibits or witnesses shall be used during the trial other than those listed and exchanged, except for good cause shown.

Plaintiffs responded to the objection by arguing that until Bleak's testimony at trial they had been unsure of the means of access Bleak had used to reach the claims. Therefore, they argued, the impeachment evidence was necessarily nonspecific until Bleak had been pinned down on cross-examination. On that basis, the trial court overruled defendants' objection. The trial judge has broad discretion to permit or deny admission of evidence not listed in the pretrial statement. *See Adroit Supply Co. v. Electric Mutual Liability Ins. Co.,* 112 Ariz. 385, 390, 542 P.2d 810, 815 (1975); *Carver v. Salt River Valley Water Users' Association,* 104 Ariz. 513, 516, 456 P.2d 371, 374 (1969). Defendants claim the trial court abused its discretion in this case, but we disagree. It is quite often difficult if

---

7. At trial, defendants conceded that the report fell within the Ariz.R.Evid. 803(18) exception to the hearsay rule as a report relied upon by an expert witness and the report was received into evidence as an exhibit. While 803(18) allows experts to testify from learned treatises and reports, it states that statements from such materials may not be received as exhibits. This was not an issue on appeal. We believe, however, that the report more properly fell within the 803(8) public records and reports exception to the hearsay rule and so could have been received as an exhibit.

not impossible for counsel to know precisely what type of impeachment will be necessary and available until the testimony of the witness is actually heard at trial. It is certainly well within the trial court's discretion to determine whether such a situation exists and to allow counsel to add to or vary from the impeachment list. It is seldom that any prejudice can result from this, since Rule VI(a)(7) does not provide for the parties to exchange impeachment lists, but, rather, requires only that the impeachment list be sealed and filed with the clerk.

## SUFFICIENCY OF THE EVIDENCE

Defendants claim that the verdict is contrary to the weight of the evidence and the evidence is insufficient to support that verdict and judgment. Our review of the record leads us to the opposite conclusion. The key issues in the case were whether the Saunders-Tejano claims became subject to Hecla's relocation because of abandonment or failure to perform the annual labor, whether Bleak had properly relocated the Big Sandy claims, and whether Bleak had abandoned any claims or made them subject to relocation by failing to perform annual labor. The evidence was in sharp conflict on these issues and resolution of those conflicts was for the jury, subject to the trial court's discretionary power to grant a new trial if it thought the verdict was against the weight of the evidence. Since the jury resolved the factual conflicts in favor of the plaintiffs and the trial judge did not conclude that the verdict was against the weight of the evidence, we cannot disturb the verdict and judgment unless we find that there is no substantial evidence to support some essential element of the action. *McFarlin v. Hall,* 127 Ariz. 220, 224, 619 P.2d 729, 733 (1980). On a review of this record, we cannot make that finding.

The judgment below and denial of defendants' motion for new trial are affirmed.

HOLOHAN, C.J., and CAMERON, J., concur.