744 P.2d 1182
David P. PANKRATZ, Plaintiff
Counter-defendant-Appellee,

v.

Carl D. WILLIS and Anne Willis,
husband and wife, Defendants
Counter-claimants-Appellants.

1 CA–CIV 8519.

Court of Appeals of Arizona,
Division 1, Department A.

June 4, 1987.

Reconsideration Denied June 19, 1987.

Review Denied Oct. 27, 1987.

Helm & Kyle, Ltd. by Margaret R. Tinsley, Tempe, for plaintiff counterdefendant-appellee.

Miller, Mark & Simon, Ltd. by Leonard J. Mark, Loren Molever, Phoenix, for defendants counterclaimants-appellants.

## OPINION

RICHARD M. DAVIS, Judge Pro Tem.

This is an action for intentional infliction of emotional distress pursuant to § 46 of

the *Restatement (Second) of Torts* (1965).[1] The plaintiff-appellee David Pankratz is the former son-in-law of defendants-appellants Carl and Anne Willis, whose daughter Laraine, the former spouse of appellee, elected to disappear with their child. Plaintiff in essence charged that the defendants, acting intentionally, made the disappearance possible. Laraine, a named defendant, was never personally served with process and did not appear.

Judgment was entered on a jury verdict for plaintiff assessing damages at $125,-000. The grandparents' appeal challenges the judgment on 17 grounds, and three additional questions are presented in their effort to revive a defeated counterclaim also charging infliction of distress, as well as abuse of process. While several of the points raised by appellants on the main claim require close analysis, we find no reversible error.

## FACTS

We state the facts as we must view them, in the light most favorable to upholding the verdict and judgment. *McFarlin v. Hall,* 127 Ariz. 220, 224, 619 P.2d 729, 733 (1980); *Venerias v. Johnson,* 127 Ariz. 496, 499, 622 P.2d 55, 58 (App.1980).

Laraine Willis, the only child of Carl and Anne, was married to appellee in 1979. Christa Pankratz was born of the marriage. Shortly after Christa's birth, and notwithstanding frictions which were becoming evident in the marriage, appellants provided $30,000 for the Pankratzes to purchase a home in 1980. Carl Willis took back a note from his daughter, which provided for repayment if the marriage was dissolved.

Marital discord increased, and Laraine filed a petition for dissolution in 1981. The dissolution proceedings were long and acrimonious, the major issue being custody of Christa. The decree entered in December, 1982, granted legal custody to Laraine with

a defined schedule of visitation rights for David. Tensions between the former spouses over Christa continued after the decree.

According to appellants, on or about April 14, 1983, they drove Laraine and Christa to the Disneyland area in metropolitan Los Angeles. That night, at a motel, Anne Willis suffered another of a series of recurring diarrhea attacks related to gall bladder surgery which she had undergone some seven or eight months earlier. As a result of that and the inability to obtain Anne's prescription drug in California (she took none with her), the Willises drove back to Arizona the next day, leaving Laraine and Christa at the motel near Disneyland. One or two days later Laraine called her parents in Phoenix and told them that she and Christa were not coming home. According to all of the testimony, the only person known to have seen Laraine since is an American lawyer named Francis Peel, practicing in Geneva, Switzerland, who met with Laraine in May, 1983. Laraine was 36 years old at the time of her disappearance; Christa was four and a half.

Appellee's action is based upon the theory that Laraine was markedly dependent, financially and otherwise, upon her parents and that appellants enabled Laraine to disappear with Christa, something she could not have accomplished otherwise. Appellee's case is built upon circumstantial evidence, as follows.

Laraine was a graduate of Arizona State University and later studied music and operatic singing in San Francisco for one year, Paris for one year, and Geneva for two years. This was done wholly at her parents' expense. Over the years Laraine had done some professional singing, some music and kindergarten instruction, and secretarial or bookkeeping work, but she had never wholly supported herself. The secretarial and bookkeeping work was her most recent occupation and was done part-

1. § 46(1), pertinent here, reads as follows:
**§ 46. Outrageous Conduct Causing Severe Emotional Distress**
(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

time for a Dr. Sage, a friend of the Willises and Anne Willis' employer.

Appellants paid Laraine's attorney fees in the divorce proceedings. After the separation, appellants, residents of Prescott since Carl's retirement from Garrett Corporation in 1981, vacated an apartment they had previously rented in Phoenix and stayed at Laraine's house when Anne Willis' work required her to be in Phoenix.

Laraine did not have her own checking account. She placed all of her funds, including the support payments from appellee, in her parents' checking account, and Carl Willis would give her cash when she requested money. There was no showing that she had other significant resources.

The telephone records of both Laraine's phone in Phoenix and appellants' phone in Prescott were introduced into evidence. Notable were four telephone calls from appellants' Prescott home to Laraine's home in Phoenix on March 30, 1983, and one call by Laraine to Geneva, Switzerland, on the same day. Also notable were two calls from appellants' number in Prescott to Laraine's number in Phoenix on March 16, 1983, the day before Laraine applied for a copy of a birth certificate for Christa.

On April 6, 1983, Laraine executed a general, "durable" power of attorney in favor of Carl Willis. The document had been originally drawn by Laraine's lawyer in March. Carl Willis testified that the power was executed in his favor so that he could negotiate and complete the sale of Laraine's residence, which was too big for her and Christa. The power, however, was without limitation and accordingly could be and was used by Carl Willis to attend to post-disappearance loose ends such as filing Laraine's income tax return for 1983 and cashing refund checks payable to her.

The trip to California took place the day after appellee's last visit with Christa and five days before the next scheduled visit. It was undocumented, and the Willises could not remember the name of the motel where they stayed or the town or specific area in which it was located. Certain other

details of the trip were clearly recalled. Each traveler took only one suitcase, according to the Willises. Carl Willis testified that he assumed that Laraine had money to get home because she did not ask him for any.

On April 19, 1983, three or four days after the Willises returned to Arizona, appellee came to Laraine's residence to pick up Christa for his scheduled visitation. He was met by Carl, who told him that Laraine had gone to California and had not yet indicated when she would be back. The jury could have found that Laraine called her parents as early as April 16 or 17 and told them that she and Christa would not be coming home. Appellee testified that Carl was unusually tense, hostile, and belligerent at this meeting. This was in contrast to Carl's testimony that he was "devastated" to the point of distraction by Laraine's suddenly communicated decision. Appellee called or saw Carl approximately five times over the next few days. Appellee testified that Carl always told him essentially the same thing, that Laraine was in California and had not yet indicated when she would come home. David testified that Carl never told him that Laraine had told her father that she and Christa were not going to be coming home at all.

In the weeks and months that followed, appellants paid all Laraine's obligations, gave away Laraine's dog, had her phone disconnected, packed and moved into storage Christa's and Laraine's personal effects, and eventually sold her house and car. Carl filed Laraine's 1983 income tax return and received her 1982 and 1983 tax refunds.

Appellants testified that Laraine called them a total of approximately seven times after she disappeared. None of the calls was at all informative as to where she and Christa were or as to other significant vital information. Appellants further testified that they had not directly or indirectly provided Laraine with any funds since her departure. Appellee has not shown otherwise.[2] Appellants' position in the litigation

---

2. Also, Carl Willis' testimony that a $35 check he wrote to the Passport Office was to renew his own passport stands unrebutted.

is that Laraine made a personal decision which they felt obliged to respect and that they needed to go on with their lives, however sadly, in respect to their only daughter and grandchild. Appellants changed their own phone number to an unlisted number in July, 1983. They testified that they had not received correspondence from Laraine and had no means of reaching her.

Appellee took various measures in a vigorous attempt to find Christa. He attempted through counsel to depose appellants in post-dissolution proceedings in early May, 1983. The depositions were finally taken on July 25. Appellee's counsel in these proceedings testified that he was met with what he thought were inordinate requests by appellants' lawyers to delay taking the depositions.

Appellee also engaged private detectives in California and Prescott. The detective in Prescott testified that he did extensive surveillance on appellants' home and concluded that no one was living there for extensive periods of time in the summer of 1983. Appellants disputed this testimony.

Appellee is a corporate pilot for Garrett Corporation, a position he obtained after the marriage. While his formal job performance reviews did not suffer after Laraine's and Christa's disappearance and his quest to find them, his superiors testified that there was, in fact, some deterioration in his performance. One fellow pilot gave this testimony:

Well, as a pilot David has always been very professional and an excellent pilot. Since this disappearance, of course, this is all he has thought about and worked on. Therefore, in the cockpit his performance level, I would say has diminished somewhat simply because this has been on his mind continually.

At one point, appellee took himself off of active flying duty. Christa's whereabouts dominated his attention. Appellee testified that he suffered from anger and depression and physical ailments including headaches and hemorrhoids. He sought out some psychiatric counseling and some biofeedback therapy in an effort, in his words, to channel his anger and depression more constructively. There were concededly no completely disabling effects.

The trial court's minute entry denying appellants' motion for new trial stated:

The damages award in this case is not so high as to shock the conscience and not so high as to be unsupported by the evidence. The recorded testimony relevant to the issue is supplemented by the Plaintiff's trial appearance, and the demeanor evidence presented to the jury. The Court concludes that the jury could have reasonably determined from all the evidence that this Plaintiff's injury was so severe and permanent as to make appropriate a compensatory damages award of $125,000.

The facts relating to the counterclaim and certain other facts will be referred to where appropriate. We will hereafter refer to the species of the main claim as a "§ 46 action," and all "comments" not otherwise identified refer to the comments in the *Restatement (Second) of Torts* (1965) under § 46.

## PRELIMINARY CONTENTIONS

Appellants initially contend that appellee merely alleged a civil conspiracy, not actionable in Arizona, and that a duty-creating "special relationship" between the litigants is essential to the claim asserted, and absent. Both contentions may be quickly disposed.

A civil conspiracy is not actionable in Arizona, *Tovrea Land and Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 131, 412 P.2d 47, 63 (1966), but appellee's complaint clearly alleged a § 46 claim. Once a contemplated tortious act is committed, the actors are simply joint tort-feasors. *See Lloyd v. Loeffler*, 694 F.2d 489, 497 (7th Cir.1982) (custody interference).

Appellants cite *Markman v. Lachman*, 602 S.W.2d 350 (Tex.Civ.App.1980), for the proposition that a special relationship is essential and lacking. *Markman* is a civil conspiracy case wherein the defendant

grandparents had concededly given the plaintiff the only information as to the grandchild's address that they knew, but had agreed with their daughter in New York to remain ignorant of the latter's residence. In contrast to Arizona, the Texas Supreme Court has never fully adopted § 46. *See Annot.,* 38 A.L.R. 4th 998, 1031 (1985).

A § 46 claim may and sometimes does arise out of some economic or other defined relationship between the parties, comment e, but a relationship is not among the requisite elements, that is, (1) extreme and outrageous conduct, (2) engaged in intentionally or recklessly, (3) causing emotional distress, (4) which is severe.

Appellants also cite the fact that A.R.S. § 25–337(C) expressly authorizes imposition of attorney's fees and costs only upon a parent for interference with custody. There is no implied intent in this statute to bar a § 46 claim.[3]

## SUFFICIENCY OF THE EVIDENCE—INTENTIONAL CONDUCT

Appellants contend that there are four insufficiencies in the evidence which required the trial judge to grant their motions for directed verdict or for judgment notwithstanding the verdict. These are the asserted failure of the appellee to show: (1) intentional or reckless conduct on the part of the Willises designed or nearly certain to cause severe emotional distress; (2) conduct on the part of the Willises—as opposed to Laraine—which was extreme and outrageous; (3) conduct on the part of the Willises—again as opposed to Laraine—

which caused distress; and (4) that appellee suffered distress which was in fact severe. We will address these claimed insufficiencies in the order indicated.

Where the sufficiency of the evidence is challenged by a motion for judgment notwithstanding the verdict, we review the record for evidence substantial enough upon a favorable view so that reasonable men could discern facts to support the verdict. *Young v. Environmental Air Products, Inc.,* 136 Ariz. 206, 213, 665 P.2d 88, 95 (App.1982), *approved as modified on other grounds,* 136 Ariz. 158, 665 P.2d 40 (1983); *Midas Muffler Shop v. Ellison,* 133 Ariz. 194, 197, 650 P.2d 496, 499 (App. 1982), and cases cited.[4]

This case calls forth the observation that a § 46 claim generally requires affirmative conduct.[5] *Davidson v. City of Westminster,* 32 Cal.3d 197, 210, 649 P.2d 894, 901, 185 Cal.Rptr. 252, 259 (1982); *Ledger v. Tippitt,* 164 Cal.App.3d 625, 642, 210 Cal. Rptr. 814, 823 (1985). There must be conduct "intended to inflict injury or engaged in *with the realization that injury will result." Davidson,* 32 Cal.3d at 210, 649 P.2d at 901, 185 Cal.Rptr. at 259 (emphasis added). As stated in another case, *Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145, 148 (1974):

> This [intentional or reckless conduct] element is satisfied where the wrongdoer has the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result.

We state these principles because they help to delineate the necessarily narrow

---

3. It should be noted that although appellee was granted a change in the legal custody of Christa to himself prior to trial, this is not an action for interference with custody pursuant to § 700 of the *Restatement (Second) of Torts. See Annot.,* 49 A.L.R. 4th 7 (1986). Nor is it in any sense an action for "harboring," or alienating the affections of a child. *See id.*

4. There is no claim by appellants that a clear and convincing or other extraordinary burden of proof applies.

5. One commentator suggests that there is a narrow strain of § 46 cases where this is not so.

These are actions involving emergencies against healthcare providers, who are always licensed and sometimes subsidized by the public. *See* Givelber, *The Right to Minimum Social Decency,* 82 Columbia Law Review 42, 72 (1982). Professor Givelber might place *Lucchesi v. Stimmell,* 149 Ariz. 76, 716 P.2d 1013 (1986), in that category. The Givelber article is a perceptive analysis of a number of aspects of the § 46 action.

The employer sexual harrassment cases may also be exceptional in this regard. *See Ford v. Revlon, Inc.,* 153 Ariz. 38, 734 P.2d 580 (1987).

basis of our decision on the sufficiency of the circumstantial evidence in this case. The Willises were of course free to benefit and subsidize their daughter for any innocent purposes as they saw fit. Further, if they had been genuinely surprised by Laraine's telephone call on April 16 or 17, that is, if they had no complicity in her plans, they could have chosen a wholly passive course without incurring § 46 liability, regardless of their state of mind toward appellee. Stated another way, neither § 46 nor any other principle would require the Willises under innocent circumstances to take any affirmative steps to find Laraine or to help appellee in any manner in his efforts toward that end. These principles were explicitly conceded by appellee at trial.

Having made these points, we turn to appellants' first specific contention. It is very brief, and simply asserts that there is "no proof" that the Willises were privy to or knowingly involved in Laraine's disappearance. Appellants generally use the term "proof" to mean direct proof; they pay little or no appreciable attention to the fact that circumstantial evidence is of equal probative dignity to direct evidence. *State v. Harvill*, 106 Ariz. 386, 476 P.2d 841 (1970); *Farm-Aero Service, Inc. v. Henning Produce, Inc.*, 23 Ariz.App. 239, 240, 532 P.2d 181, 182 (1975). They therefore generally ignore the circumstantial evidence, and advance no analysis of it or of specific areas of its asserted insufficiency. Their basic contention was that the jury was bound to believe appellants' testimony and find for them, in part because appellants had never previously manifested any ill will toward appellee.

While it is true that the Willises advance a completely innocent hypothesis, or explanation, of the facts which were proved, the ambiguity of the innocent hypothesis is readily apparent when reason exists to question it. Thus, for example, while there was a good reason for Laraine to give Carl Willis a power of attorney to sell her house, there was no particularly innocent reason advanced or readily imaginable why she should give him a general and durable power of attorney to do all legal acts which

she might do. A finder of fact could not fail to note that the general power gave Carl the ready means to tie up all loose ends after Laraine's disappearance.

■ The key question then is whether there was legitimate cause for reasonable jurors to doubt the Willises' hypothesis. We conclude there was.

First, the financial arrangements between the parties were extraordinary in this day and age. Laraine and Christa were a separate household. Even though the Willises were "subsidizing" Laraine, the parties' commingling of money and Carl's parceling out of cash to Laraine could be taken as indicating an unusual degree of financial dependence and a relationship which would be more apt to promote disclosures than a more usual *modus operandi*.

We believe Carl's behavior on April 19 and immediately thereafter to be particularly susceptible of a finding of complicity. Carl claimed in his testimony that he was "devastated" to the point of distraction by the substance of Laraine's recently phoned message. Appellee found him not "devastated" at all, but instead, hostile, belligerent, tense, and uncommunicative. More importantly, Carl failed on April 19 or thereafter to tell David that Laraine had clearly advised him that she *was not coming home*. Carl's communications encouraged an actually unfounded hope that Laraine would soon decide to come back to Arizona, and so advise Carl accordingly. Carl's behavior could reasonably be perceived as a means of allowing Laraine more time to disappear.

There are a number of other facets of the evidence, such as the testimony of the private detective that the Willises were away from their home for long periods of time in the summer of 1983, which the jury could reasonably have weighed against the Willises' explanations and contradictory testimony. There was the wholly undocumented and only selectively recalled trip to the Disneyland area, and the long delay by the Willises in submitting to deposition by appellee. A number of the responses of

the Willises at trial could be perceived as showing selective or only minimal memory. There was little flesh to accompany the bare bones of their innocent hypothesis.

It is fundamental that a plaintiff must prove his case and that a verdict cannot rest upon nothing more than speculation and conjecture. Coincidences and ambiguous circumstances abound in life, but there is a point on the continuum where a given set of coincidences and circumstances takes on an appearance such that reasonable people can say that they discern the likelihood of a design. When all of the evidence is considered on an integrated basis, we believe that that point has been reached here and that the evidence provides the basis for a determination that the Willises acted intentionally. Beyond that, there is an ample evidentiary basis from which the jury could have concluded that the Willises were at least reckless in ignoring the likely effect that the disappearance of appellee's child would have on him.

## SUFFICIENCY OF THE EVIDENCE: EXTREME AND OUTRAGEOUS CONDUCT

Courts that have squarely faced the issue have concluded that the unilateral separation of a child from its parent can be extreme and outrageous conduct within the meaning of § 46. *Kajtazi v. Kajtazi*, 488 F.Supp. 15, 20 (E.D.N.Y.1978); *Raftery v. Scott*, 756 F.2d 335 (4th Cir.1985); *Sheltra v. Smith*, 136 Vt. 472, 392 A.2d 431 (1978); *Plante v. Engel*, 124 N.H. 213, 469 A.2d 1299, (1983). With the possible exception of *McDougald v. Jenson*, 596 F.Supp. 680, 685 (N.D.Fla.1984), we are not aware of authority to the contrary.

■■■ We agree. Like the chief district judge in *Kajtazi*, we can think of few acts more calculated to engender a sense of outrage in both the victim and the average member of the community. The fact that child stealing by a divorced parent may frequently occur does not blunt the extremity or outrageousness of the conduct.[6] Our holding is confined to the facts before us,

involving an apparently permanent deprivation.

Appellants do not disagree as far as Laraine is concerned. Much of their argument simply amounts to a denial of complicity, which we have already rejected. Beyond that appellants stress the court's statements in *Watts v. Golden Age Nursing Home*, 127 Ariz. 255, 619 P.2d 1032 (1980), that the atrocious and utterly intolerable conduct that is actionable under § 46 is a "quite narrow range" of conduct "at the very extreme edge of the spectrum of possible conduct." 127 Ariz. at 258, 619 P.2d at 1035.

We have found an adequate showing of complicity. That makes appellants parties to Laraine's outrageous objective and conduct. The fact that appellants were, in the nature of things, only auxiliary does not diminish the character of the ultimate result.

While, as will hereafter appear, we cannot agree with every aspect of a recent opinion in Maryland where there has apparently been considerable recent § 46 litigation, we note the following statements in *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 59–60, 502 A.2d 1057, 1064 (1986):

> To satisfy that [extreme and outrageous] element, conduct must completely violate human dignity. "[E]xtreme and outrageous conduct exists only if 'the average member of the community must regard the defendant's conduct ... as being a complete denial of the plaintiff's dignity as a person.'" The conduct must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.

(Citations omitted.)

Tested by these standards, as well, we find appellants' conduct extreme and outrageous within § 46.

## SUFFICIENCY OF THE EVIDENCE: CAUSATION

Appellants' argument here again attempts to distinguish between distress

---

6. *See also* § 700 of the *Restatement (Second) of Torts*, comment g, stating that a custodial parent

can recover for emotional distress caused by abduction of the child.

caused by Laraine and distress solely attributable to appellants' conduct. It is urged that because there was no expert medical testimony distinguishing the effects between the acts of Laraine and the acts of the Willises, there was no proof of any distress caused by the Willises.

The argument fails for the same basic reason that the preceding argument failed. There was only one wrong here, brought about, as the jury found and as we have held that it could find, by the acts of three persons. Sophisticated questions of incremental causation can be involved in infliction of distress cases,[7] but they have not been presented here.

## SUFFICIENCY OF THE EVIDENCE: SEVERE DISTRESS

Appellants focus this part of their argument on *Midas Muffler Shop v. Ellison* and *Venerias v. Johnson.* *Midas* establishes that there is a line of demarcation between mere distress and the required severe distress. *Venerias v. Johnson* includes language that indicates that a claimant must show "severely *disabling* emotional response [emphasis added]," and holds that nervousness ("a nervous wreck") without any further showing of loss of earnings, physical damage, related use of medication, or being "hampered in any respect from performing ... daily functions" does not constitute severe distress. *Venerias* sets forth comment j, defining severe emotional distress. 127 Ariz. at 500, 622 P.2d at 59.

In some of its language *Venerias* appears to track *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977). That decision alludes to a requirement of *"severely* disabling emotional response."* 380 A.2d at 616 (emphasis in original). *Hamilton v. Ford Motor Credit Co.* cites the same requirement in even stronger terms:

> One must be unable to function ∴ one must be unable to attend to necessary matters....
>
> ....

[R]ecovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves.

502 A.2d at 1064–65.

*Venerias* and the Maryland cases are all plainly sound decisions on their facts but some of their verbiage appears to reach beyond what we perceive to be the fair import of § 46 as outlined in the *Restatement,* at least in a case like the present one.

Stare decisis dictates that we do not lightly recede from a principle previously announced by this court, and that is especially true where the position is supported by substantial authority from elsewhere. Here, the statement in *Venerias* that the plaintiff was required to show he suffered a "severely disabling emotional response" to the defendants' conduct is supported by the Maryland cases and by cases from Nebraska and Wisconsin. *Davis v. Texaco, Inc.,* 210 Neb. 67, 313 N.W.2d 221, 223 (1981), *Alsteen v. Gehl,* 21 Wis.2d 349, 124 N.W.2d 312, 318 (1963).

■ But while we are reluctant to recede, we think it is called for here. Our own supreme court rendered one of the earliest § 46 decisions, *Savage v. Boies,* 77 Ariz. 355, 272 P.2d 349 (1954). That decision focuses strongly upon the principles set forth in the *Restatement,* and while emphasizing the necessity of a showing of severity, does not suggest a disability requirement.

The earliest champion of liability for outrageous conduct is the late Judge Calvert Magruder. It was (then Professor) Magruder's article in 49 *Harvard Law Review* 1033 (1936) which provided the initial impetus for § 46. Magruder's formulation does not suggest a requirement of disability:

> We would expect, then, the gradual emergence of a broad principle somewhat to this effect: that one who, without just cause or excuse, and beyond all the bounds of decency, purposely causes a disturbance of another's mental and emotional tranquillity of so acute a na-

---

7. Suggested in Givelber, *supra* note 4, at 49.

ture *that harmful physical consequences might be not unlikely to result,* is subject to liability in damages for such mental and emotional disturbance even though no demonstrable physical consequences actually ensue.

Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv.L.Rev. 1033, 1058 (1936) (emphasis added).

The *Restatement* negates a requirement of bodily harm. Comment k. Some of the commentary reflects a primary concern that the source of the claim be genuine, not fictitious or fanciful. The critical part of *Restatement,* comment j, states that "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." That rule does not require that a disabling response be actually suffered, but only that the conduct be of such a nature as to be apt to cause such a result.

Based on *Savage v. Boies* and subsequent authority, we feel compelled to follow the indications of the *Restatement,* which do not include a requirement that the plaintiff must have actually suffered a disabling response. At the same time that we reject that single aspect of *Venerias,* we also reject any notion that any response less than "severe" can support a § 46 action. *Midas Muffler Shop v. Ellison.*[8]

■ Turning to the evidence here, it is clear that distress must be extreme. The trial judge obviously felt that appellee suffered extreme distress, and we agree that the evidence is susceptible of such a conclusion. In regard to its unendurable character, under the circumstances here, we believe that the apparently permanent loss of

a child, an only child at that, has created distress of the requisite proportion.

## ADMISSIBILITY OF THE TAPED TELEPHONE CONVERSATION

Appellants next contend that the verdict is infected by the receipt of three items or types of evidence.

After appellee obtained Laraine's telephone records, he placed a call to the number in Switzerland which Laraine had called on March 30. The answering party was a member of the New York bar with whom Laraine had consulted in May, 1983, approximately a month after her disappearance. Appellee recorded the conversation, and over appellants' objection the tape was admitted into evidence and heard by the jury.

Appellants challenge the relevance of the tape and assert its inadmissibility under Rule 804, Arizona Rules of Evidence, and its overriding prejudice under Rule 403, Arizona Rules of Evidence.

In regard to relevance, appellants contend that the conversation had nothing to do with them. The trial court, however, admitted the tape because it was relevant to the plaintiff's "state of mind, if nothing else." The state of mind nexus was sufficient.

■ The trial judge found positively that the tape met the qualifying requirements of Rule 804(b)(5). Critically, he found that there were circumstantial guarantees of evidentiary trustworthiness. *See State v. Robles,* 135 Ariz. 92, 94–95, 659 P.2d 645, 647–48 (1983). We have listened to the tape, and it seems sufficiently clear that the person at the other end of the line is

---

**8.** We note the argument by Dean Emeritus Pedrick in *Intentional Infliction: Should Section 46 Be Revised?,* 13 Pepperdine L.Rev. 1 (1985), that the time is ripe for the § 46 action to become a "dignitary tort," like a battery, with no requirement of a severe distress response. While Dean Pedrick's thesis seems markedly ambitious from a remedy-for-wrong point of view, it appears to proceed on the assumption that the flood-tide equilibrium in § 46 litigation has been reached, an assumption that seems debatable. See *Hamilton v. Ford Motor Credit Corp.*

Much of Dean Pedrick's argument can also be read as indicating that the compromise of values represented by § 46 is presently manageable. The premise in Reporter Prosser's comment in 1957 that § 46 was qualified "to keep the courts from running wild with this thing" (34 *A.L.I. Proceedings* 291) is appreciable when one considers that the injury in question is psychic or emotional and often not objectively manifested.

the person he purports to be. There was no error in regard to relevance and the basic ruling under Rule 804.

We see no merit at all in appellants' claim of overriding prejudice under Rule 403. The tape simply establishes that at one point Laraine was in Switzerland, a fact consistent with her own stated intentions as related by appellants' testimony. We can perceive of no particular tendency of the tape to prejudice appellants in any legally cognizable way.

## ADMISSIBILITY OF THE BIRTH CERTIFICATE APPLICATION

An application for a birth certificate for Christa signed by Laraine and dated March 17, 1983, was admitted into evidence. Appellants argue that it should have been excluded because no link to them was shown. Appellee's position is that the birth certificate application was a probable link in the chain or process of planning the disappearance.

■ A measure of discretion is accorded the trial court in evidentiary matters. *Burgbacher v. Mellor*, 112 Ariz. 481, 483, 543 P.2d 1110, 1112 (1975). The application followed by one day two telephone calls between the parties' Prescott and Phoenix numbers. We see no error.

## ADMISSIBILITY OF ATTORNEY EVANS' TESTIMONY CONCERNING DELAYS

Appellants' last complaint in regard to the admissibility of evidence is that appellee's counsel in the divorce proceeding was erroneously permitted to testify about delays involved in taking appellants' depositions in the weeks following the disappearance.

Appellants have not, however, specified with any particularity the ruling or rulings of the trial court asserted to be erroneous. That failure alone is sufficient reason for us to decline to discuss the question further. *Rodriguez v. Besser Co.*, 115 Ariz. 454, 461–62, 565 P.2d 1315, 1322–23 (App. 1977), and cases cited. The point is by no means merely formal, because the trial court at one point sustained appellants' objection to this line of testimony. We have, however, reviewed Evans' testimony for the two days he testified, and we find no prejudicially erroneous ruling. In general, at least, lawyers are agents of their clients. *Green Acres Trust v. London*, 142 Ariz. 12, 18, 688 P.2d 658, 664 (App.1983).

## JURY INSTRUCTIONS: INTRODUCTION

The jury was instructed in a number of the terms of § 46 and the comments thereto. Appellants concede that many of these instructions were proper, at least as far as they went. We think it appropriate to observe that the *Restatements* are written by the legal community largely for the legal community and do not always make the clearest and most understandable jury instructions. At the same time we recognize that the claim defined by § 46 is still in its early definitional stages, and that other sound models for jury instructions are not abundant.

## INSTRUCTION DEFINING OUTRAGEOUS CONDUCT

■ Appellants' first argument is that the trial court should have further defined outrageous conduct by the addition of an instruction that:

Conduct which may be otherwise unjustifiable is not necessarily conduct which is within the quite narrow range of 'extreme and outrageous' conduct necessary to establish a claim of intentional infliction of emotional distress.

We agree with appellants that their requested additional instruction, which is closely taken from language in *Watts v. Golden Age Nursing Home*, could have been given. Conduct may be otherwise tortious, and even illegal, and not be outrageous within the purview of § 46. Comment d; *Lewis v. Bell*, 45 Wash.App. 192, 724 P.2d 425 (1986).

■ But we do not agree that failure to give the requested addition was reversible error in this case. There is no duty to instruct on every refinement suggested by counsel. *Fridena v. Evans*, 127 Ariz. 516,

522, 622 P.2d 463, 469 (1980), and cases cited. Appellants' counsel explicitly conceded in argument to the jury that Laraine's conduct—abducting Christa—was outrageous. The critical issue for jury determination was appellants' involvement. Appellants conceded that outrageous conduct was otherwise properly defined. In the context of this case, the requested additional instruction was an inessential refinement.

## REQUESTED INSTRUCTION ON DISABLING DISTRESS

In their second instruction issue, appellants contend that the trial court should have instructed the jury that it was necessary for appellee to demonstrate "disabling" emotional distress, as evidenced by inability to function and the prescribed taking of medications, etc. Here again, appellants concede that the jury was otherwise properly charged in regard to the necessity of showing severe emotional distress.

We have dealt with the substance of this contention above, and in our view, the law should not discourage people from coping with intolerable conduct on pain of losing their remedies when their distress is otherwise manifestly severe. The trial court did not err.

## INSTRUCTION ON CONDUCT AS EVIDENCE OF DISTRESS

Appellants next contend that the trial judge should not have read the following portion of § 46, comment j of *Restatement* to the jury:

Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.

Appellants' specific contention here is that the jurors could have inferred or assumed the existence of outrageous conduct on the part of the appellants by the giving of the instruction even though (as they assert) there was no evidence of any.

In our opinion, this portion of the *Restatement* commentary is not a desirable jury instruction. It does not straightfor-

wardly declare the law or tell the jury what to do and it contingently characterizes (as "important") a kind of evidence. A jury might more appropriately be instructed that in determining whether distress is severe it can consider the normally expectable effect of the conduct in question. For reasons stated above, however, we must reject the specific contention advanced by appellants. Nor do we think that in the context of this particular case the instruction was prejudically confusing.

## INSTRUCTION ON DAMAGES

The objection here that the adjective "severe" is not used in a reference to emotional distress in the instruction on damages is met by a statement of the requirement of severity elsewhere and the principle that the instructions are read not piecemeal but as an integrated whole. *Kauffman v. Schroeder*, 116 Ariz. 104, 106, 568 P.2d 411, 413 (1977).

The further objection here that there were no medical bills in evidence and no testimony to support an instruction for the recovery of reasonable and necessary medical expenses is met by the testimony of Dr. Field that he saw appellee on two occasions, for which he charged $180, and his further testimony that appellee was referred to him by another psychiatrist who was concerned about his mental state, that appellee showed marked depression, and that he suggested that appellee continue to see him. The evidence and inferences therefrom must be favorably viewed in support of giving a requested instruction, and it is the substance of the testimony, rather than the use of talismanic words, which is determinative. *Compare Saide v. Stanton*, 135 Ariz. 76, 78, 659 P.2d 35, 37 (1983).

## "KNOWINGLY AIDING AND ASSISTING"

Appellants' next contention is that the trial court should have instructed the jury that it was required to find that the Willises "knowingly aided and assisted" Laraine

according to the tenor of their fourth requested instruction.

A flaw in this argument, however, is that the reference to knowingly aiding and assisting is but a small part of appellants' requested number 4, and other parts of the requested instruction contain ambiguities and overemphases which amount to misstatements of the law. The trial court was not required to separate the sheep from the goats. *Public Service Co. of Oklahoma v. Bleak,* 134 Ariz. 311, 319, 656 P.2d 600, 608 (1982).

### ADDITION OF "SOLELY"

Appellants next contend that the trial court improperly modified their requested instruction 7 by adding the word "solely" in the second sentence (the trial court also added "independent" to the first sentence) of the following:

> In determining whether Carl Willis and Anne Willis acted in the manner that David Pankratz claims they acted, and whether such action if any caused severe emotional distress to David Pankratz, you are not to consider the *independent* actions of Laraine Willis.

> Carl Willis and Anne Willis are not responsible for any improper acts that you may determine have been committed *solely* by Laraine Pankratz Willis.

(Emphasis added.) Appellants' argument on this issue is as follows:

> Thus, the jury could have easily been confused and misled into the belief that the only way they could find in favor of the Willises would be to have a situation where the Willises were completely unaware of the actions or intent of Lorraine [sic]. However, the opinions in *Watts v. Golden Age Nursing Home, supra,* and *Cluff, supra,* indicate that the jury could have determined that the Willises not only knew of the intentions of Lorraine, [sic] but that they actually helped her, yet were still not liable to Pankratz for intentionally causing him severe emotional distress.

We do not read *Watts* and *Cluff v. Farmers Ins. Exchange,* 10 Ariz.App. 560, 460 P.2d 666 (1969), as do appellants. The

instruction as modified clearly conveys the principle that appellants were liable for their actions, not the unaided actions of their daughter. We find no error.

### MULTIPLE CAUSATION

Appellants next contend the trial court's instruction on multiple causation was improper because the principle only applies in negligence cases. The RAJI instruction reads as follows:

> More than one person may be liable for causing an injury. A defendant may not avoid liability by claiming that some other person (whether or not named as a defendant in this action) helped cause the injury.

Contrary to appellants' arguments, the joint tort-feasor principle was applied in the early common law to intentional torts. 3 Harper, James & Gray, *The Law of Torts* § 10.1, at 1 (2d ed. 1986). Indeed, "[c]ases in which there is a concert of action or a common plan are the clearest examples of joint torts." *Id.,* at 2. The RAJI instruction was proper.

### REPETITION OF ELEMENTS

Appellants' last jury instruction contention that the portion of the charge which summarized the jury's options in regard to returning verdicts should have enumerated the elements of the tort is again met by the principle that the charge must be considered as a whole. *Kauffman v. Schroeder.*

### PASSION AND PREJUDICE

Appellants next contend that the verdict was the result of passion and prejudice and that the trial judge abused his discretion in not ordering a new trial on that basis. To the extent that this contention is based upon the asserted lack of sufficient evidence, that subject is dealt with above.

■ Appellants state that the trial took place during a period when a great deal of media attention was focused on missing and stolen children. No attempt was made to demonstrate the extent of this in the

trial court, and the trial judge permitted appellants' counsel to extensively voir dire the panel on the subject prior to selection of jurors. This accordingly could not be the basis for a new trial.

■ Appellants contend that certain statements of counsel to the jury encouraged an impassioned and prejudiced verdict and an excessive verdict (we deal with excessiveness in the remittitur context below). In the statements referred to, appellee's counsel stated in effect that appellee sought or would use a recovery to continue searching for his child. Appellants never moved for a mistrial on this basis, and the jury was thereafter properly instructed, as we have held.

No trial is perfect and this one was not. Yet the trial court kept the case well within evidentiary bounds when its attention was called to irrelevant material, as it frequently was. The motion directed to the trial court evokes the exercise of a substantial degree of discretion, in part because the trial judge was there and in a position to assess first hand the assertedly prejudicial factors. *Suciu v. AMFAC Distributing Corp.*, 138 Ariz. 514, 520, 675 P.2d 1333, 1339 (App.1983).

We cannot say that any of the factors cited by counsel singly or in combination indicate that the trial court abused its discretion here.

### SIZE OF VERDICT

Appellants argue that even if the verdict is sustainable against other attack, it should be reduced as excessive. Appellants essentially argue that there were no special damages and that $125,000 as general damages is without basis and shockingly large.

We have alluded to Dr. Field's testimony in regard to special damages. Appellee also testified that he paid out approximately $9,000 to private detectives. This was corroborated to the extent of $700 paid to Detective Palmer in Prescott. There was other testimony from which the jury could have surmised that appellee incurred considerable expense in attempting to locate Christa.

The broadest range of discretion is vested in the trial court in ruling on a motion for additur or remittitur. *See generally Creamer v. Troiano*, 108 Ariz. 573, 503 P.2d 794 (1972). The trial court's decision will not be disturbed on appeal in the absence of clear abuse. *Mammo v. State*, 138 Ariz. 528, 533, 675 P.2d 1347, 1352 (App.1983).

■ One hundred twenty-five thousand dollars is a great deal of money. It is, for example, more money than many couples amass in a lifetime. But the appellee here has apparently lost his child. He does not even know with certainty that his child is alive. We do not believe that $50,000, or $100,000 is manifestly any more reasonable than $125,000, including some allowance for expenses incurred.

The court in *Kajtazi v. Kajtazi*, awarded the plaintiff well over $100,000 for various related torts. 488 F.Supp. at 21–22. Additional future recovery is not sought here. *Cf. Kajtazi*. We find no abuse of discretion.

### COUNTERCLAIM

Appellants' claim for malicious prosecution was dismissed prior to trial and is not in issue here. The trial judge granted appellee's motion for a directed verdict on appellants' claim for intentional infliction of emotional distress. A claim for abuse of process was submitted to the jury, which returned a verdict for appellee.

### APPELLANTS' § 46 CLAIM

Appellants claimed that appellee inflicted distress upon them by his pursuit of discovery in the divorce proceedings, by sponsoring surveillance, and by bringing the instant action.

*Restatement* comment g reads, in part, as follows:

The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon

his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.

■ Comment g precisely fits this case. Appellee pursued his legal rights. He was privileged to do so.

## ABUSE OF PROCESS

■ Appellants' abuse of process claim was brought pursuant to § 682 of the *Restatement (Second) of Torts,* which provides for an action when a plaintiff uses a legal process primarily for a purpose other than that for which it was intended. The action for abuse of process assumes an ulterior motive, usually extortionate in nature. W. Prosser, *Law of Torts* § 121, at 857–58 (4th ed. 1971). Where a lawful end is pursued by appropriate process, incidental motives of spite or greed are not actionable (comment b to § 682). Appellants' theory here was that appellee "knew" that appellants had no knowledge of their daughter's and Christa's whereabouts but he nevertheless "harassed" them by obtaining superior court orders compelling discovery in an effort to "flush out" Laraine and Christa.

While the specific issue is not before us, even given the conflicts in the testimony, we seriously doubt that this claim was properly presented to the jury. Appellants concededly subsidized Laraine, they often resided with her, they drove her to California, and appellee had reason to believe that Laraine was not herself economically independent. Under those circumstances, nothing in the principles addressed by § 682 required appellee and his counsel to sit by with gracious deference and refrain from vigorously employing discovery measures while Laraine perfected a complete and trackless disappearance with appellee's child. Ulterior purpose has not been shown.

Appellants' essential contention here is that they were entitled to judgment notwithstanding the verdict. What we have already said indicates clearly that the contention must be rejected.

Appellants' last set of contentions is that the verdict was impassioned and prejudiced, that attorney Evans should not have been allowed to testify about delays in discovery, and that the jury should have been instructed in terms of a purpose to "harass" appellants rather than in the terms of *Restatement* § 682. The first two arguments are only reiterations of arguments we have previously rejected, and the term "harass" is far too lacking in specificity to be the basis of an appropriate jury instruction in this area.

## CONCLUSION

The judgment of the superior court is in all respects affirmed.

CONTRERAS, P.J., concurs.

NOTE: Richard M. Davis was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. Art. VI, § 3 and A.R.S. §§ 12–145 to –147.

BROOKS, Judge, specially concurring:

I concur in the result reached by the majority opinion.