Richard J. GORE, Appellant,

v.

Betty TAYLOR, Jim Seymour, Robert R. Jones, Paul Hoover, Steve Stalcup, and Five Way Investment Corporation, Appellees.

No. 70716.

Court of Appeals of Oklahoma, Division No. 4.

April 10, 1990.

Martha Martin, Mahaffey & Gore, P.C., Oklahoma City, for appellant.

R. Scott Savage, Moyers, Martin, Santee, Imel & Tetrick, Tulsa, for appellees.

BRIGHTMIRE, Chief Judge.

The dispositive issue presented for review in this abuse of process action filed by the counterclaimants is whether the third-party plaintiff's challenge to the sufficiency of the evidence should have been sustained and a verdict directed for the third-party plaintiff.

We answer in the affirmative and reverse the judgment appealed.

I

Underlying the lawsuit—initially filed by a bank in Pottawatomie County against the guarantors of a $580,000 note, appellant Richard J. Gore, Gregory L. Mahaffey, and one George Shaw—is the business involvement of the parties in the exploration for oil and gas.

During the pleading stages defendants Gore and Mahaffey became third-party plaintiffs by filing third-party actions, on August 12, 1986, against a number of third-party defendants, namely, Sunbelt Energy Development Company, Donald L. Goodman, and Goodco Drilling and Operating Company. On May 18, 1987, they added

Betty Taylor, Jim Seymour, Robert R. Jones, Paul Hoover, Steve Stalcup, and Five Way Investment Corporation. The third-party claims were that Goodman and Sunbelt had made fraudulent misrepresentations inducing the third-party plaintiffs to sign the guarantees in question and that the guarantors had been damaged because assets of Sunbelt had been fraudulently transferred by Sunbelt to Five Way Investment Corporation at the direction of Sunbelt's stockholders, the other third-party defendants. The allegations were founded on representations previously made by Mr. Goodman, who later at trial admitted he had made them but was "mistaken."

On September 18, 1987, shortly before filing an answer to the third-party petition, third-party defendant Stalcup testified he called Mr. Mahaffey and asked him why the third-party lawsuit had been filed against the third-party defendants. He said Mr. Mahaffey replied "that he felt like we had fraudulently transferred an asset." Later on in the conversation, continued Mr. Stalcup, the two started talking about attorney fees and Mr. Mahaffey said he was upset about the fact his legal fees had never been paid and "if there was someway that we could get together on that, fine, to settle our differences, but, otherwise, if this puts a little pressure on us to settle the matter, then so be it. And that was the conversation."[1]

A few days later, on September 24, 1987, the third-party defendants, Taylor, Seymour, Jones, Hoover, Stalcup and Five Way Investment Corporation, filed a counterclaim against third-party plaintiffs Mahaffey and Gore, alleging the latter had

instituted the third-party action "maliciously and with no reasonable or probable cause." They further alleged the action was instituted "with process not for the purpose of pursuing a legally cognizable claim but for the purpose of harassment and to coerce the payment of a previous obligation [attorney fee] allegedly owed [to the law firm of] Mahaffey and Gore." The third-party counterclaim asked for the attorney fee incurred in defending the third-party claim and punitive damages in the amount of $100,000 against each third-party plaintiff.

Late in the week preceding the January 4, 1988, trial date, Mahaffey and Gore received some documents from opposing counsel which had been requested during discovery. They showed, contrary to Goodman's representation, that the main asset owned by Sunbelt Company, a drilling rig, was mortgaged—a fact that Mr. Mahaffey concluded virtually destroyed their claim that Sunbelt assets had been fraudulently transferred. Consequently, on the morning of trial they dismissed their third-party claim and the counterclaim proceeded to trial.

At the close of the evidence the third-party plaintiffs demurred to the counterclaimants' evidence on the ground it was insufficient to sustain a cause of action for abuse of process.[2]

On January 6, 1988, judgment by inference was entered on jury verdicts awarding the counterclaimants $12,112.06 compensatory and $4,000 punitive damages against third-party plaintiff Mahaffey, and $12,112.06 compensatory and $1,000 punitive damages against third-party plaintiff Gore.[3] Timely filed motions for a new trial

---

1. The attorney fee controversy pre-dates the lawsuit by several years and arose from the representation of the third-party defendants by the law firm of Mahaffey & Gore in a 1984 lawsuit between Sunbelt Energy Development Company, of which the third-party defendants were stockholders, and Greenland Drilling Company.

2. For purposes of resolving the issues raised on this appeal, we will treat this challenge to the sufficiency of the counter-claimants' evidence as the functional equivalent of a motion for a directed verdict.

3. We refer to the judgment as being one by inference because after reciting the two separate verdicts returned by the jury, the journal entry of judgment does not grant the counterclaimants a judgment for the amounts the jury found should be awarded but instead sets out the following "judgment":

    IT IS THEREFORE ORDERED AND ADJUDGED by the Court that based upon the verdict that the Defendants, Robert R. Jones, Paul Hoover, Steve Stalcup, Jim Seymour, Betty Taylor, and Five Way Investment Corporation, are granted judgment against the

were overruled and third-party plaintiff Gore appeals.[4]

## II

The first proposition raised by the appellant is that his challenge to the counterclaimants' evidence should have been sustained and the counterclaim should have been dismissed for lack of sufficient evidence to sustain a cause of action for the tort of abuse of process.

To begin with, it is to be noted that there is no statutory law specifically creating a civil wrong known as abuse of process. The tort has, however, been recognized for many years by the high court of this state, but for the most part it has been defined in general terms and applied to factual situations which differ from the one we have here.

The earliest case in Oklahoma to recognize abuse of process as an actionable tort appears to be *Spencer v. Arnold,* 152 Okl. 189, 4 P.2d 55 (1931). It was an action brought to recover for various "acts of trespass" which included: (1) dispossession of the plaintiff, from land she owned, by the defendant and a deputy sheriff under the "claimed authority of writs of assistance issued in [a foreclosure] action ... to which she was not a party;" (2) "an assault and battery;" and (3) "a wrongful arrest in an attempt to eject her from the premises." In short, after being told by the plaintiff that she owned the land and had never given a mortgage, the defendant nevertheless without further inquiry obtained writs of assistance from the court on two occasions and along with a deputy sheriff set to gain possession of the land. In the process all the unlawful acts complained of were committed. The jury returned a verdict for the plaintiff for both actual and punitive damages, and the defendant appealed. The court emphasized the wrongfulness of the defendant's aggressive attempts to dispossess the plaintiff with process issued in a case to which she was not a party. And, at the end of the opinion, after saying that the verdict was fully justified, the court added this:

"The conduct was tortious and was an abuse of process, for which [the defendant] was responsible as well as was the deputy sheriff. *James v. Graham,* [114 S.C. 107, 78 S.E. 82 (1913)]; 50 C.J. Process, § 383, p. 618, and cases cited."

Later the high court handed down *Neil v. Pennsylvania Life Insurance Company,* 474 P.2d 961 (Okl.1970). In it the court expressed doubt that the plaintiffs' evidence presented "a case of abuse of process" as distinguished from a "malicious use of process." The court's concern was whether a restraining order which had been issued at the request of the defendant and which formed the foundation for the plaintiffs' abuse of process claim, was in fact and effect a temporary injunction. If the latter, it was void because no bond had been posted as required by 12 O.S.1961 § 1392. The court drew on the text of 1 Am.Jur.2d *Abuse of Process* § 1 (1964) (footnotes omitted), to establish that "[a]buse of legal process consists in the malicious misuse or misapplication of that process to accomplish some purpose not warranted or commanded by the writ" and that in "brief, it is the malicious perversion of a regularly issued civil or criminal process, for a purpose and to obtain a result not lawfully warranted or properly attainable thereby." And the court further said that, in substance, the distinction between "abuse of process" and "malicious use of process" is that "malicious use of process is the employment of process for its obstensible purpose, but without reasonable or probable cause, whereas the malicious abuse of process is the employment of a process in a manner not contemplated by law, or to obtain an object [*sic*] which such a process is not intended by law to effect." *Id.* at § 2 (footnotes omitted). Finally, the court concluded that the plaintiff had made no effort to prove malice in the procure-

---

Plaintiffs, Richard J. Gore and Gregory L. Mahaffey, with interest thereon at 9.95%, and for defendants' costs to be set by the Court.

**4.** Gore and Mahaffey filed separate appeals which were consolidated under the Gore appeal No. 70,716. Later Mr. Mahaffey dismissed his appeal.

ment of the temporary restraining order—which it said could not be inferred merely from the procurement of the order—and reversed the mid-trial dismissal and remanded for a new trial.

In *Tulsa Radiology Associates v. Hickman,* 683 P.2d 537 (Okl.App.1984), the court of appeals upheld the trial court's sustention of defendant Hickman's general demurrer to the plaintiffs' amended petition alleging malicious prosecution and abuse of process in bringing an earlier medical malpractice lawsuit against the plaintiff doctors—a lawsuit which ended when the trial court sustained a demurrer to the malpractice evidence. The court founded its decision on the results of Professor Prosser's analysis of the common law in existence in 1971 as follows:

> "The essential elements of an action for abuse of process are: (1) issuance of process, (2) an ulterior purpose, and (3) a wilful act in the use of process not proper in the regular conduct of the proceeding. Prosser, *Handbook of the Law of Torts,* § 121 (4th Ed.1971). The third element is explained as:
>
> > [s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, ...; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of coersion [*sic*] to obtain a collateral advantage, not properly involved in the proceeding itself...."

And in *Ellison v. An–Son Corp.,* 751 P.2d 1102 (Okl.App.1987), the defendant corporation had previously sued the plaintiffs in federal court to cancel a lease the plaintiffs had acquired from certain mineral owners. The federal court case was dismissed for failure of the corporation to exhaust its administrative remedies. The plaintiffs then filed an action against the corporation alleging malicious prosecution and abuse of process. The trial court, among other things, granted the corporation a summary judgment and the plaintiffs appealed. The court of appeals reversed the summary judgment on the ground there existed an issue concerning whether the corporation had an ulterior motive for filing the federal lawsuit. The court applied the same principles of law relied on in *Hickman* pertaining to the abuse of process tort.

It is significant that the author of the *Hickman* opinion dissented in *Ellison.* While the basis for the dissent was not stated, it may well be that it was based on a failure of the plaintiffs to prove the third element of abuse of process which the *Hickman* court considered an essential one, namely, that the corporation must have committed "a wilful act in the use of process not proper in the regular conduct of the proceeding;"[5] that the mere filing or maintenance of a lawsuit even for an improper purpose or motive is not an abuse of process; and that the *Ellison* plaintiffs had to plead and prove some "willful act taken by the defendant in addition to filing the complaint."[6]

### III

█ In the case at bar the complaint is not that the process was illegally issued, but that there was an improper use or perversion of the process after it had been issued.[7] Prosser made it clear that there must be some "definite *act* or *threat* not authorized by the process" and that "there is no liability where the defendant has done nothing more than carry out the process to

---

5. *Hickman,* 683 P.2d at 539.

6. *Kollodge v. State,* 757 P.2d 1024 (Alaska 1988). Of course, commencement of a lawsuit without probable cause may give rise to a cause of action for malicious prosecution. *Lewis v. Crystal Gas Co.,* 532 P.2d 431 (Okl.1975).

7. It is generally accepted across the country that the gist of an action for "abuse of process" is the improper use or perversion of process after it has been issued. *Jackson & Scherer, Inc. v. Washburn,* 209 Kan. 321, 496 P.2d 1358 (1972); *Publix Drug Co. v. Breyer Ice Cream Co.,* 347 Pa. 346, 32 A.2d 413 (1943); *Fite v. Lee,* 11 Wash. App. 21, 521 P.2d 964 (1974).

its authorized conclusion, even though with bad intentions." [8]

In *Restatement (Second) of Torts* § 682 (1977), the general principle of abuse of process is stated thus:

"One who uses a legal process, whether criminal or civil, against another *primarily* to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." (Emphasis added.)

Comment "a" states that the gravamen of the misconduct for which liability is imposed is the "misuse" of legal process for some purpose other than that which it was designed to accomplish.

Comment "b" explains the significance of the term "Primarily" this way:

"b. *'Primarily.'* The significance of this word is that there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant. Thus the entirely justified prosecution of another on a criminal charge, does not become abuse of process merely because the instigator dislikes the accused and enjoys doing him harm; nor does the instigation of justified bankruptcy proceedings become abuse of process merely because the instigator hopes to derive benefit from the closing down of the business of a competitor."

Thus it has been held that if process "is used for its proper and intended purpose, the mere fact that it has some other collateral effect," such as incidentally and indirectly exerting pressure for collection of a debt, "does not constitute abuse of process." [9] In *Crease v. Pleasant Grove City*,[10] a municipality caused a criminal charge to be filed against the plaintiff at the insistence of a councilman because of the plaintiff's refusal to pay a sewer bill. The plaintiff was found guilty and, after

being jailed for eighteen days, he filed an action which eventually became an abuse of process action against the city and the councilman based on post-conviction process. The city was eliminated as a party prior to trial and the jury returned a verdict against the councilman. He appealed and the judgment was reversed because it had not been shown that the councilman had committed any willful act relating to the complained of post-conviction process.

With respect to the "primary" purpose doctrine, the courts have held that a counterclaim admittedly filed for the purpose of encouraging settlement is not an improper motive or purpose.[11]

## IV

Turning now to the evidence in the instant case, we examine it to see whether the third-party defendants presented any evidence which proved directly or circumstantially all the essential elements of the alleged abuse of process on the part of third-party plaintiff Gore.

Preliminarily, we point out that the third-party defendants acknowledge the essential elements of subject tort as discussed in *Ellison*, Prosser's work, and the *Restatement (Second) of Torts*. They argue the evidence was sufficient "to establish that Mahaffey and Gore sued for an ulterior motive and misused the process with the intent to coerce a result not properly a part of their lawsuits." They add that Mr. Stalcup's testimony regarding the September 18, 1987, conversation with Mr. Mahaffey "standing alone and taken as true ... established a prima facie case for abuse of process" and that the "burden of proving an ulterior motive and a direct overt act after the filing of the lawsuit was met." The testimony relied upon was mentioned earlier but is referred to more fully at this point.

---

**8.** W. Prosser, *Handbook of the Law of Torts* § 121 (4th ed. 1971) (emphasis added).

**9.** *Crease v. Pleasant Grove City*, 30 Utah 2d 451, 519 P.2d 888 (1974).

**10.** *Id.*

**11.** *Pankratz v. Willis*, 155 Ariz. 8, 744 P.2d 1182 (1987); *Wong v. Panis*, 772 P.2d 695 (Hawaii App.1989).

Mr. Stalcup was asked during direct examination to tell the jury what his conversation with Mr. Mahaffey on September 18, 1987, regarded. Began the witness:

"I asked—I initiated the phone conversation. I asked him, directly, why in the world he was filing—why he was suing the individuals in this case as well as Fiveway [*sic*]. And he mentioned that he felt like we had fraudulently transferred an asset and then briefly after that, he went, immediately to what really has him upset, was the fact that we never paid his legal fees. And if there was some way that we could get together on that, fine, to settle our differences, but otherwise, if this puts a little pressure on us to settle the matter, then so be it. And that was the conversation."

During cross-examination of Mr. Stalcup this colloquy occurred:

"Now, you had a conversation, did you not, this conversation that you had on September 18th, and you testified previously that Mr. Mahaffey said that he sued you because he thought that you had fraudulently transferred the rig, is that correct?" the lawyer asked.

"What conversation?" asked the witness.

"The 18th. The September 18th conversation," said the examiner.

"Yes," answered the witness.

"And then later on, you and he started talking about attorney's fees, didn't you?"

"Yes," said the witness.

"And he said he was mad at you for not paying the attorney's fees?"

"That's correct," the witness said.

The third-party defendants conclude that the foregoing testimony is evidence of an "attempt" of Messrs. Mahaffey and Gore "to coerce payment of an alleged debt through the use of their lawsuit."

We disagree. First of all whatever might be said about the significance of the conversation so far as Mr. Mahaffey is concerned, there is no basis for imputing it to Mr. Gore.

Secondly, the conversation in question was admittedly initiated by one of the third-party defendants—not one of the third-party plaintiffs.

Thirdly, the most we can make out of the alleged conversation is that Mahaffey and Gore filed subject third-party lawsuits primarily to reduce their losses resulting from the guarantee based on information and belief that Mr. Stalcup and his fellow stockholders had fraudulently transferred a major Sunbelt asset. Then, during the ensuing discussion, the matter of an unpaid attorney fee arose and Mr. Stalcup discovered Mr. Mahaffey was still upset about that and, from what Mr. Stalcup reported the conversation to be, Mr. Mahaffey suggested in substance that if the lawsuit had the incidental effect of putting a little pressure on the third-party defendants to settle the fee matter, "then so be it," that is, that's all right, too.

We see nothing about the conversation that could amount to "a willful act" or, as the third-party defendants put it, "a direct overt act." Nor do we see anything coercive about what Mr. Mahaffey said. And certainly there was nothing threatening. The evidence is that Mr. Stalcup had discussed the attorney fee situation with Mr. Mahaffey long before the present litigation started and he already knew how the latter felt about the matter. To comment on or speculate about what the incidental effect of a properly filed lawsuit might be on some other matter is not the type of "willful act" contemplated by the authorities mentioned earlier.

The conclusion we reach is that there is no evidence that either Mr. Gore or Mr. Mahaffey ever initiated any conversation, made any threats, or committed any willful act with regard to the third-party defendants and certainly none that could be said to be a misuse or misapplication of process.

V

We hold, therefore, that the third-party plaintiff's motion for a directed verdict in

his favor should have been sustained. The judgment appealed is reversed and the cause remanded with instructions to grant third-party plaintiff Gore a judgment against the third-party defendants notwithstanding the verdict on their counterclaim.

Reversed and remanded with instructions.

REIF and STUBBLEFIELD, JJ., concur.